(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SKILLING *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 08–1394.   Argued March 1, 2010—Decided June 24, 2010

Founded in 1985, Enron Corporation grew from its headquarters in Houston, Texas, into the seventh highest-revenue-grossing company in America. Petitioner Jeffrey Skilling, a longtime Enron officer, was Enron's chief executive officer from February until August 2001, when he resigned. Less than four months later, Enron crashed into bankruptcy, and its stock plummeted in value. After an investigation uncovered an elaborate conspiracy to prop up Enron's stock prices by overstating the company's financial well-being, the Government prosecuted dozens of Enron employees who participated in the scheme. In time, the Government worked its way up the chain of command, indicting Skilling and two other top Enron executives. These three defendants, the indictment charged, engaged in a scheme to deceive investors about Enron's true financial performance by manipulating its publicly reported financial results and making false and misleading statements. Count 1 of the indictment charged Skilling with, *inter alia,* conspiracy to commit "honest-services" wire fraud, 18 U. S. C. §§371, 1343, 1346, by depriving Enron and its shareholders of the intangible right of his honest services. Skilling was also charged with over 25 substantive counts of securities fraud, wire fraud, making false representations to Enron's auditors, and insider trading.

In November 2004, Skilling moved for a change of venue, contending that hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors. He submitted hundreds of news reports detailing Enron's downfall, as well as affidavits from experts he engaged portraying community attitudes in Houston in comparison to other potential venues. The District Court denied the motion, concluding that pretrial publicity did not warrant a presump-

tion that Skilling would be unable to obtain a fair trial in Houston. Despite incidents of intemperate commentary, the court observed, media coverage, on the whole, had been objective and unemotional, and the facts of the case were neither heinous nor sensational. More-over, the court asserted, effective *voir dire* would detect juror bias.

In the months before the trial, the court asked the parties for ques-tions it might use to screen prospective jurors. Rejecting the Gov-ernment's sparer inquiries in favor of Skilling's more probing and specific questions, the court converted Skilling's submission, with slight modifications, into a 77-question, 14-page document. The questionnaire asked prospective jurors about their sources of news and exposure to Enron-related publicity, beliefs concerning Enron and what caused its collapse, opinions regarding the defendants and their possible guilt or innocence, and relationships to the company and to anyone affected by its demise. The court then mailed the questionnaire to 400 prospective jurors and received responses from nearly all of them. It granted hardship exemptions to about 90 indi-viduals, and the parties, with the court's approval, further winnowed the pool by excusing another 119 for cause, hardship, or physical dis-ability. The parties agreed to exclude, in particular, every prospec-tive juror who said that a preexisting opinion about Enron or the de-fendants would prevent her from being impartial.

In December 2005, three weeks before the trial date, one of Skill-ing's co-defendants, Richard Causey, pleaded guilty. Skilling re-newed his change-of-venue motion, arguing that the juror question-naires revealed pervasive bias and that news accounts of Causey's guilty plea further tainted the jury pool. The court again declined to move the trial, ruling that the questionnaires and *voir dire* provided safeguards adequate to ensure an impartial jury. The court also de-nied Skilling's request for attorney-led *voir dire* on the ground that potential jurors were more forthcoming with judges than with law-yers. But the court promised to give counsel an opportunity to ask follow-up questions, agreed that venire members should be examined individually about pretrial publicity, and allotted the defendants jointly two extra peremptory challenges.

*Voir dire* began in January 2006. After questioning the venire as a group, the court examined prospective jurors individually, asking each about her exposure to Enron-related news, the content of any stories that stood out in her mind, and any questionnaire answers that raised a red flag signaling possible bias. The court then permit-ted each side to pose follow-up questions and ruled on the parties' challenges for cause. Ultimately, the court qualified 38 prospective jurors, a number sufficient, allowing for peremptory challenges, to empanel 12 jurors and 4 alternates. After a 4-month trial, the jury

found Skilling guilty of 19 counts, including the honest-services-fraud conspiracy charge, and not guilty of 9 insider-trading counts.

On appeal, Skilling raised two arguments relevant here. First, he contended that pretrial publicity and community prejudice prevented him from obtaining a fair trial. Second, he alleged that the jury improperly convicted him of conspiracy to commit honest-services wire fraud. As to the former, the Fifth Circuit initially determined that the volume and negative tone of media coverage generated by Enron's collapse created a presumption of juror prejudice. Stating, however, that the presumption is rebuttable, the court examined the *voir dire,* found it "proper and thorough," and held that the District Court had empaneled an impartial jury. The Court of Appeals also rejected Skilling's claim that his conduct did not indicate any conspiracy to commit honest-services fraud. It did not address Skilling's argument that the honest-services statute, if not interpreted to exclude his actions, should be invalidated as unconstitutionally vague.

*Held*:

1. Pretrial publicity and community prejudice did not prevent Skilling from obtaining a fair trial. He did not establish that a presumption of juror prejudice arose or that actual bias infected the jury that tried him. Pp. 11–34.

(a) The District Court did not err in denying Skilling's requests for a venue transfer. Pp. 11–19.

(1) Although the Sixth Amendment and Art. III, §2, cl. 3, provide for criminal trials in the State and district where the crime was committed, these place-of-trial prescriptions do not impede transfer of a proceeding to a different district if extraordinary local prejudice will prevent a fair trial. Pp. 11–12.

(2) The foundation precedent for the presumption of prejudice from which the Fifth Circuit's analysis proceeded is *Rideau* v. *Louisiana*, 373 U. S. 723. Wilbert Rideau robbed a small-town bank, kidnaped three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession, which, without his knowledge, was filmed and televised three times to large local audiences shortly before trial. After the Louisiana trial court denied Rideau's change-of-venue motion, he was convicted, and the conviction was upheld on direct appeal. This Court reversed. "[T]o the tens of thousands of people who saw and heard it," the Court explained, the interrogation "in a very real sense *was* Rideau's trial—at which he pleaded guilty." *Id.,* at 726. "[W]ithout pausing to examine . . . the *voir dire,*" the Court held that the "kangaroo court proceedings" trailing the televised confession violated due process. *Id.,* at 726–727. The Court followed *Rideau* in two other cases in which media coverage manifestly tainted criminal

prosecutions. However, it later explained that those decisions "cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process." *Murphy* v. *Florida*, 421 U. S. 794, 798–799. Thus, prominence does not necessarily produce prejudice, and juror *impartiality* does not require *ignorance*. See, *e.g., Irvin* v. *Dowd*, 366 U. S. 717, 722. A presumption of prejudice attends only the extreme case. Pp. 12–16.

(3) Important differences separate Skilling's prosecution from those in which the Court has presumed juror prejudice. First, the Court has emphasized the size and characteristics of the community in which the crime occurred. In contrast to the small-town setting in *Rideau*, for example, the record shows that Houston is the Nation's fourth most populous city. Given the large, diverse pool of residents eligible for jury duty, any suggestion that 12 impartial individuals could not be empaneled in Houston is hard to sustain. Second, although news stories about Skilling were not kind, they contained no blatantly prejudicial information such as Rideau's dramatically staged admission of guilt. Third, unlike *Rideau* and other cases in which trial swiftly followed a widely reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse. Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption. Pp. 16–18.

(4) The Fifth Circuit presumed juror prejudice based primarily on the magnitude and negative tone of the media attention directed at Enron. But "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539, 554. Here, news stories about Enron did not present the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice, and Houston's size and diversity diluted the media's impact. Nor did Enron's sheer number of victims trigger a presumption. Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and follow-up *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated. Finally, while Causey's well publicized decision to plead guilty shortly before trial created a danger of juror prejudice, the District Court took appropri-

ate steps to mitigate that risk. Pp. 18–19.

(b) No actual prejudice contaminated Skilling's jury. The Court rejects Skilling's assertions that *voir dire* did not adequately detect and defuse juror prejudice and that several seated jurors were biased. Pp. 20–34.

(1) No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*. Jury selection is "particularly within the province of the trial judge." *Ristaino* v. *Ross*, 424 U. S. 589, 594–595. When pretrial publicity is at issue, moreover, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." *Mu'Min* v. *Virginia*, 500 U. S. 415, 427. The Court considers the adequacy of jury selection in Skilling's case attentive to the respect due to district-court determinations of juror impartiality and of the measures necessary to ensure that impartiality. Pp. 20–21.

(2) Skilling failed to show that his *voir dire* fell short of constitutional requirements. The jury-selection process was insufficient, Skilling maintains, because *voir dire* lasted only five hours, most of the District Court's questions were conclusory and failed adequately to probe jurors' true feelings, and the court consistently took prospective jurors at their word once they claimed they could be fair, no matter any other indications of bias. This Court's review of the record, however, yields a different appraisal. The District Court initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by Skilling. That survey helped to identify prospective jurors excusable for cause and served as a springboard for further questions; *voir dire* thus was the culmination of a lengthy process. Moreover, inspection of the questionnaires and *voir dire* of the seated jurors reveals that, notwithstanding the flaws Skilling lists, the selection process secured jurors largely uninterested in publicity about Enron and untouched by the corporation's collapse. Whatever community prejudice existed in Houston generally, Skilling's jurors were not under its sway. Relying on *Irvin* v. *Dowd*, 366 U. S., at 727–728, Skilling asserts the District Court should not have accepted jurors' promises of fairness. But a number of factors show that the District Court had far less reason than the trial court in *Irvin* to discredit jurors' assurances of impartiality: News stories about Enron contained nothing resembling the horrifying information rife in reports about Leslie Irvin's rampage of robberies and murders; Houston shares little in common with the rural community in which Irvin's trial proceeded; circulation figures for Houston media sources were far lower than the 95% saturation level

recorded in *Irvin;* and Skilling's seated jurors exhibited nothing like the display of bias shown in *Irvin.* In any event, the District Court did not simply take venire members at their word. It questioned each juror individually to uncover concealed bias. This face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and news sources, gave the court a sturdy foundation to assess fitness for jury service. Pp. 22–30.

(3) Skilling's allegation that several jurors were openly biased also fails. In reviewing such claims, the deference due to district courts is at its pinnacle: " 'A trial court's findings of juror impartiality may be overturned only for manifest error.' " *Mu'Min*, 500 U. S., at 428. Skilling, moreover, unsuccessfully challenged only one of the seated jurors for cause, "strong evidence that he was convinced the [other] jurors were not biased and had not formed any opinions as to his guilt." *Beck* v. *Washington*, 369 U. S. 541, 557–558. A review of the record reveals no manifest error regarding the empaneling of Jurors 11, 20, and 63, each of whom indicated, *inter alia,* that he or she would be fair to Skilling and would require the Government to prove its case. Four other jurors Skilling claims he would have excluded with extra peremptory strikes, Jurors 38, 67, 78, and 84, exhibited no signs of prejudice this Court can discern. Pp. 31–34.

2. Section 1346, which proscribes fraudulent deprivations of "the intangible right of honest services," is properly confined to cover only bribery and kickback schemes. Because Skilling's alleged misconduct entailed no bribe or kickback, it does not fall within the Court's confinement of §1346's proscription. Pp. 34–51.

(a) To place Skilling's claim that §1346 is unconstitutionally vague in context, the Court reviews the origin and subsequent application of the honest-services doctrine. Pp. 34–38.

(1) In a series of decisions beginning in the 1940s, the Courts of Appeals, one after another, interpreted the mail-fraud statute's prohibition of "any scheme or artifice to defraud" to include deprivations not only of money or property, but also of intangible rights. See, *e.g., Shushan* v. *United States*, 117 F. 2d 110, which stimulated the development of the "honest-services" doctrine. Unlike traditional fraud, in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest-services doctrine targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment. Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's

"honest services." Most often these cases involved bribery of public officials, but over time, the courts increasingly recognized that the doctrine applied to a private employee who breached his allegiance to his employer, often by accepting bribes or kickbacks. By 1982, all Courts of Appeals had embraced the honest-services theory of fraud. Pp. 34–37.

(2) In 1987, this Court halted the development of the intangible-rights doctrine in *McNally* v. *United States*, 483 U. S. 350, 360, which held that the mail-fraud statute was "limited in scope to the protection of property rights." "If Congress desires to go further," the Court stated, "it must speak more clearly." *Ibid.* P. 37.

(3) Congress responded the next year by enacting §1346, which provides: "For the purposes of th[e] chapter [of the U. S. Code that prohibits, inter alia, mail fraud, §1341, and wire fraud, §1343], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Pp 37–38.

(b) Section 1346, properly confined to core cases, is not unconstitutionally vague. Pp. 38–51.

(1) To satisfy due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U. S. 352, 357. The void-for-vagueness doctrine embraces these requirements. Skilling contends that §1346 meets neither of the two due-process essentials. But this Court must, if possible, construe, not condemn, Congress' enactments. See, *e.g., Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 571. Alert to §1346's potential breadth, the Courts of Appeals have divided on how best to interpret the statute. Uniformly, however, they have declined to throw out the statute as irremediably vague. This Court agrees that §1346 should be construed rather than invalidated. P. 38–39.

(2) The Court looks to the doctrine developed in pre-*McNally* cases in an endeavor to ascertain the meaning of the phrase "the intangible right of honest services." There is no doubt that Congress intended §1346 to refer to and incorporate the honest-services doctrine recognized in Courts of Appeals' decisions before *McNally* derailed the intangible-rights theory of fraud. Congress, it bears emphasis, enacted §1346 on the heels of *McNally* and drafted the statute using that decision's terminology. See 483 U. S., at 355, 362. Pp. 39–40.

(3) To preserve what Congress certainly intended §1346 to cover, the Court pares the pre-*McNally* body of precedent down to its core: In the main, the pre-*McNally* cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks

supplied by a third party who had not been deceived. In parsing the various pre-*McNally* decisions, the Court acknowledges that Skilling's vagueness challenge has force, for honest-services decisions were not models of clarity or consistency. It has long been the Court's practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction. See, *e.g.*, *Hooper* v. *California*, 155 U. S. 648, 657. Arguing against any limiting construction, Skilling contends that it is impossible to identify a salvageable honest-services core because the pre-*McNally* cases are inconsistent and hopelessly unclear. This Court rejected an argument of the same tenor in *Letter Carriers*, 413 U. S., at 571–572. Although some applications of the pre-*McNally* honest-services doctrine occasioned disagreement among the Courts of Appeals, these decisions do not cloud the fact that the vast majority of cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes. Indeed, *McNally* itself presented a paradigmatic kickback fact pattern. 483 U. S., at 352–353, 360. In view of this history, there is no doubt that Congress intended §1346 to reach *at least* bribes and kickbacks. Because reading the statute to proscribe a wider range of offensive conduct would raise vagueness concerns, the Court holds that §1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law. Pp. 41–45.

(4) The Government urges the Court to go further by reading §1346 to proscribe another category of conduct: undisclosed self-dealing by a public official or private employee. Neither of the Government's arguments in support of this position withstands close inspection. Contrary to the first, *McNally* itself did not center on non-disclosure of a conflicting financial interest, but rather involved a classic kickback scheme. See 483 U. S., at 352–353, 360. Reading §1346 to proscribe bribes and kickbacks—and nothing more—satisfies Congress' undoubted aim to reverse *McNally* on its facts. Nor is the Court persuaded by the Government's argument that the pre-*McNally* conflict-of-interest cases constitute core applications of the honest-services doctrine. Although the Courts of Appeals upheld honest-services convictions for some conflict-of-interest schemes, they reached no consensus on which schemes qualified. Given the relative infrequency of those prosecutions and the intercircuit inconsistencies they produced, the Court concludes that a reasonable limiting construction of §1346 must exclude this amorphous category of cases. Further dispelling doubt on this point is the principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland* v. *United States*, 531 U. S. 12, 25. The Court therefore resists the Government's less constrained construc-

Syllabus

tion of §1346 absent Congress' clear instruction otherwise. "If Congress desires to go further," the Court reiterates, "it must speak more clearly than it has." *McNally,* 483 U. S., at 360. Pp. 45–47.

(5) Interpreted to encompass only bribery and kickback schemes, §1346 is not unconstitutionally vague. A prohibition on fraudulently depriving another of one's honest services by accepting bribes or kickbacks presents neither a fair-notice nor an arbitrary-prosecution problem. See *Kolender*, 461 U. S., at 357. As to fair notice, it has always been clear that bribes and kickbacks constitute honest-services fraud, *Williams* v. *United States*, 341 U. S. 97, 101, and the statute's *mens rea* requirement further blunts any notice concern, see, *e.g., Screws* v. *United States*, 325 U. S. 91, 101–104. As to arbitrary prosecutions, the Court perceives no significant risk that the honest-services statute, as here interpreted, will be stretched out of shape. Its prohibition on bribes and kickbacks draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing and defining similar crimes. Pp. 48–49.

(c) Skilling did not violate §1346, as the Court interprets the statute. The Government charged Skilling with conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health to his own profit, but the Government never alleged that he solicited or accepted side payments from a third party in exchange for making these misrepresentations. Because the indictment alleged three objects of the conspiracy—honest-services wire fraud, money-or-property wire fraud, and securities fraud—Skilling's conviction is flawed. See *Yates* v. *United States*, 354 U. S. 298. This determination, however, does not necessarily require reversal of the conspiracy conviction, for errors of the *Yates* variety are subject to harmless-error analysis. The Court leaves the parties' dispute about whether the error here was harmless for resolution on remand, along with the question whether reversal on the conspiracy count would touch any of Skilling's other convictions. Pp. 49–50.

554 F. 3d 529, affirmed in part, vacated in part, and remanded.

GINSBURG, J., delivered the opinion of the Court, Part I of which was joined by ROBERTS, C. J., and STEVENS, SCALIA, KENNEDY, THOMAS, and ALITO, JJ., Part II of which was joined by ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., and Part III of which was joined by ROBERTS, C. J., and STEVENS, BREYER, ALITO, and SOTOMAYOR, JJ. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined, and KENNEDY, J., joined except as to Part III. ALITO, J., filed an opinion concurring in part and concurring in the judgment. SOTOMAYOR, J., filed an opinion concurring in part and dissenting in part, in which STEVENS and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1394

JEFFREY K. SKILLING, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2010]

JUSTICE GINSBURG delivered the opinion of the Court.

In 2001, Enron Corporation, then the seventh highest-revenue-grossing company in America, crashed into bankruptcy. We consider in this opinion two questions arising from the prosecution of Jeffrey Skilling, a longtime Enron executive, for crimes committed before the corporation's collapse. First, did pretrial publicity and community prejudice prevent Skilling from obtaining a fair trial? Second, did the jury improperly convict Skilling of conspiracy to commit "honest-services" wire fraud, 18 U. S. C. §§371, 1343, 1346?

Answering no to both questions, the Fifth Circuit affirmed Skilling's convictions. We conclude, in common with the Court of Appeals, that Skilling's fair-trial argument fails; Skilling, we hold, did not establish that a presumption of juror prejudice arose or that actual bias infected the jury that tried him. But we disagree with the Fifth Circuit's honest-services ruling. In proscribing fraudulent deprivations of "the intangible right of honest services," §1346, Congress intended at least to reach schemes to defraud involving bribes and kickbacks. Con-

struing the honest-services statute to extend beyond that
core meaning, we conclude, would encounter a vagueness
shoal. We therefore hold that §1346 covers only bribery
and kickback schemes. Because Skilling's alleged miscon-
duct entailed no bribe or kickback, it does not fall within
§1346's proscription. We therefore affirm in part and
vacate in part.

I

Founded in 1985, Enron Corporation grew from its
headquarters in Houston, Texas, into one of the world's
leading energy companies. Skilling launched his career
there in 1990 when Kenneth Lay, the company's founder,
hired him to head an Enron subsidiary. Skilling steadily
rose through the corporation's ranks, serving as president
and chief operating officer, and then, beginning in Febru-
ary 2001, as chief executive officer. Six months later, on
August 14, 2001, Skilling resigned from Enron.

Less than four months after Skilling's departure, Enron
spiraled into bankruptcy. The company's stock, which had
traded at $90 per share in August 2000, plummeted to
pennies per share in late 2001. Attempting to comprehend
what caused the corporation's collapse, the U. S. Depart-
ment of Justice formed an Enron Task Force, comprising
prosecutors and FBI agents from around the Nation. The
Government's investigation uncovered an elaborate con-
spiracy to prop up Enron's short-run stock prices by over-
stating the company's financial well-being. In the years
following Enron's bankruptcy, the Government prosecuted
dozens of Enron employees who participated in the
scheme. In time, the Government worked its way up the
corporation's chain of command: On July 7, 2004, a grand
jury indicted Skilling, Lay, and Richard Causey, Enron's
former chief accounting officer.

These three defendants, the indictment alleged,

"engaged in a wide-ranging scheme to deceive the in-

vesting public, including Enron's shareholders, . . . about the true performance of Enron's businesses by: (a) manipulating Enron's publicly reported financial results; and (b) making public statements and representations about Enron's financial performance and results that were false and misleading." App. ¶5, p. 277a.

Skilling and his co-conspirators, the indictment continued, "enriched themselves as a result of the scheme through salary, bonuses, grants of stock and stock options, other profits, and prestige." *Id.,* ¶14, at 280a.

Count 1 of the indictment charged Skilling with conspiracy to commit securities and wire fraud; in particular, it alleged that Skilling had sought to "depriv[e] Enron and its shareholders of the intangible right of [his] honest services." *Id.,* ¶87, at 318a.[1] The indictment further charged Skilling with more than 25 substantive counts of securities fraud, wire fraud, making false representations to Enron's auditors, and insider trading.

In November 2004, Skilling moved to transfer the trial to another venue; he contended that hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors. To support this assertion, Skilling, aided by media experts, submitted hundreds of news reports detailing Enron's downfall; he also presented affidavits from the experts he engaged portraying community attitudes in Houston in comparison to other potential venues.

The U. S. District Court for the Southern District of

––––––––

[1] The mail- and wire-fraud statutes criminalize the use of the mails or wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1341 (mail fraud); §1343 (wire fraud). The honest-services statute, §1346, defines "the term 'scheme or artifice to defraud'" in these provisions to include "a scheme or artifice to deprive another of the intangible right of honest services."

Texas, in accord with rulings in two earlier instituted
Enron-related prosecutions,[2] denied the venue-transfer
motion. Despite "isolated incidents of intemperate com-
mentary," the court observed, media coverage "ha[d]
[mostly] been objective and unemotional," and the facts of
the case were "neither heinous nor sensational." App. to
Brief for United States 10a–11a.[3] Moreover, "courts ha[d]
commonly" favored "effective voir dire . . . to ferret out any
[juror] bias." *Id.,* at 18a. Pretrial publicity about the case,
the court concluded, did not warrant a presumption that
Skilling would be unable to obtain a fair trial in Houston.
*Id.*, at 22a.

   In the months leading up to the trial, the District Court
solicited from the parties questions the court might use to
screen prospective jurors. Unable to agree on a ques-
tionnaire's format and content, Skilling and the Govern-
ment submitted dueling documents. On venire members'
sources of Enron-related news, for example, the Govern-

_____

   [2] See *United States* v. *Fastow*, 292 F. Supp. 2d 914, 918 (SD Tex.
2003); Order in *United States* v. *Hirko*, No. 4:03–cr–00093 (SD Tex.,
Nov. 24, 2004), Doc. 484, p. 6. These rulings were made by two other
judges of the same District. Three judges residing in the area thus
independently found that defendants in Enron-related cases could
obtain a fair trial in Houston.

   [3] Painting a different picture of the media coverage surrounding En-
ron's collapse, JUSTICE SOTOMAYOR's opinion relies heavily on affidavits
of media experts and jury consultants submitted by Skilling in support
of his venue-transfer motion. *E.g., post*, at 2, 3, 4, 5 (opinion concurring
in part and dissenting in part) (hereinafter dissent); *post*, at 5, n. 2, and
23, n. 10; *post*, at 26, and 35, n. 22. These Skilling-employed experts
selected and emphasized negative statements in various news stories.
But the District Court Judge did not find the experts' samples repre-
sentative of the coverage at large; having "[m]eticulous[ly] review[ed]
all of the evidence" Skilling presented, the court concluded that "inci-
dents [of news reports using] less-than-objective language" were
dwarfed by "the largely fact-based tone of most of the articles." App. to
Brief for United States 7a, 10a, 11a. See also *post*, at 3 (acknowledging
that "many of the stories were straightforward news items").

ment proposed that they tick boxes from a checklist of generic labels such as "[t]elevision," "[n]ewspaper," and "[r]adio," Record 8415; Skilling proposed more probing questions asking venire members to list the specific names of their media sources and to report on "what st[ood] out in [their] mind[s]" of "all the things [they] ha[d] seen, heard or read about Enron," *id.,* at 8404–8405.

The District Court rejected the Government's sparer inquiries in favor of Skilling's submission. Skilling's questions "[we]re more helpful," the court said, "because [they] [we]re generally . . . open-ended and w[ould] allow the potential jurors to give us more meaningful information." *Id.,* at 9539. The court converted Skilling's submission, with slight modifications, into a 77-question, 14-page document that asked prospective jurors about, *inter alia,* their sources of news and exposure to Enron-related publicity, beliefs concerning Enron and what caused its collapse, opinions regarding the defendants and their possible guilt or innocence, and relationships to the company and to anyone affected by its demise.[4]

————————

[4] Questions included the following: "What are your opinions about the compensation that executives of large corporations receive?"; "Have you, any family members, or friends ever worked for or applied for work with," "done business with," or "owned stock in Enron Corporation or any Enron subsidiaries and partnership?"; "Do you know anyone . . . who has been negatively affected or hurt in any way by what happened at Enron?"; "Do you have an opinion about the cause of the collapse of Enron? If YES, what is your opinion? On what do you base your opinion?"; "Have you heard or read about any of the Enron cases? If YES, please tell us the name of all sources from which you have heard or read about the Enron cases."; "Have you read any books or seen any movies about Enron? If YES, please describe."; "Are you angry about what happened with Enron? If YES, please explain."; "Do you have an opinion about . . . Jeffrey Skilling . . . [?] If YES, what is your opinion? On what do you base your opinion?"; "Based on anything you have heard, read, or been told[,] do you have any opinion about the guilt or innocence of . . . Jeffrey Skilling[?] If . . . YES . . . , please explain."; "[W]ould any opinion you may have formed regarding Enron or any of

In November 2005, the District Court mailed the questionnaire to 400 prospective jurors and received responses from nearly all the addressees. The court granted hardship exemptions to approximately 90 individuals, *id.,* at 11773–11774, and the parties, with the court's approval, further winnowed the pool by excusing another 119 for cause, hardship, or physical disability, *id.,* at 11891, 13594. The parties agreed to exclude, in particular, "each and every" prospective juror who said that a preexisting opinion about Enron or the defendants would prevent her from impartially considering the evidence at trial. *Id.,* at 13668.

On December 28, 2005, three weeks before the date scheduled for the commencement of trial, Causey pleaded guilty. Skilling's attorneys immediately requested a continuance, and the District Court agreed to delay the proceedings until the end of January 2006. *Id.,* at 14277. In the interim, Skilling renewed his change-of-venue motion, arguing that the juror questionnaires revealed pervasive bias and that news accounts of Causey's guilty plea further tainted the jury pool. If Houston remained the trial venue, Skilling urged that "jurors need to be questioned individually by both the Court *and* counsel" concerning their opinions of Enron and "publicity issues." *Id.,* at 12074.

The District Court again declined to move the trial. Skilling, the court concluded, still had not "establish[ed] that pretrial publicity and/or community prejudice raise[d] a presumption of inherent jury prejudice." *Id.,* at 14115. The questionnaires and *voir dire*, the court observed, provided safeguards adequate to ensure an impartial jury.

––––––––––

the defendants prevent you from impartially considering the evidence presented during the trial of . . . Jeffrey Skilling[?] If YES or UNSURE . . . , please explain."; "Is there anything else you feel is important for the court to know about you?" Record 13013–13026.

*Id.,* at 14115–14116.

Denying Skilling's request for attorney-led *voir dire*, the court said that in 17 years on the bench:

> "I've found . . . I get more forthcoming responses from potential jurors than the lawyers on either side. I don't know whether people are suspicious of lawyers— but I think if I ask a person a question, I will get a candid response much easier than if a lawyer asks the question." *Id.,* at 11805.

But the court promised to give counsel an opportunity to ask follow-up questions, *ibid.,* and it agreed that venire members should be examined individually about pretrial publicity, *id.,* at 11051–11053. The court also allotted the defendants jointly 14 peremptory challenges, 2 more than the standard number prescribed by Federal Rule of Criminal Procedure 24(b)(2) and (c)(4)(B). *Id.,* at 13673–13675.

*Voir dire* began on January 30, 2006. The District Court first emphasized to the venire the importance of impartiality and explained the presumption of innocence and the Government's burden of proof. The trial, the court next instructed, was not a forum "to seek vengeance against Enron's former officers," or to "provide remedies for" its victims. App. 823a. "The bottom line," the court stressed, "is that we want . . . jurors who . . . will faithfully, conscientiously and impartially serve if selected." *Id.,* at 823a– 824a. In response to the court's query whether any prospective juror questioned her ability to adhere to these instructions, two individuals indicated that they could not be fair; they were therefore excused for cause, *id.,* at 816a, 819a–820a.

After questioning the venire as a group,[5] the District Court brought prospective jurors one by one to the bench

———————
[5] Among other questions, the court asked whether sympathy toward the victims of Enron's collapse or a desire to see justice done would overpower prospective jurors' impartiality. App. 839a–840a.

for individual examination. Although the questions var-
ied, the process generally tracked the following format:
The court asked about exposure to Enron-related news
and the content of any stories that stood out in the pro-
spective juror's mind. Next, the court homed in on ques-
tionnaire answers that raised a red flag signaling possible
bias. The court then permitted each side to pose follow-up
questions. Finally, after the venire member stepped away,
the court entertained and ruled on challenges for cause.
In all, the court granted one of the Government's for-
cause challenges and denied four; it granted three of the
defendants' challenges and denied six. The parties agreed
to excuse three additional jurors for cause and one for
hardship.

By the end of the day, the court had qualified 38 pro-
spective jurors, a number sufficient, allowing for peremp-
tory challenges, to empanel 12 jurors and 4 alternates.[6]
Before the jury was sworn in, Skilling objected to the
seating of six jurors. He did not contend that they were in
fact biased; instead, he urged that he would have used

---

[6] Selection procedures of similar style and duration took place in
three Enron-related criminal cases earlier prosecuted in Houston—
*United States* v. *Arthur Andersen LLP*, No. 4:02–cr–00121–1 (SD Tex.)
(charges against Enron's outside accountants); *United States* v. *Bayly*,
No. 4:03–cr–00363 (SD Tex.) (charges against Merrill Lynch and Enron
executives for alleged sham sales of Nigerian barges); *United States* v.
*Hirko*, No. 4:03–cr–00093 (SD Tex.) (fraud and insider-trading charges
against five Enron Broadband Services executives). See Brief for
United States 9 (In all three cases, the District Court "distributed a
jury questionnaire to a pool of several hundred potential jurors; dis-
missed individuals whose responses to the questionnaire demonstrated
bias or other disqualifying characteristics; and, after further question-
ing by the court and counsel, selected a jury from the remaining venire
in one day."); Government's Memorandum of Law in Response to
Defendants' Joint Motion to Transfer Venue in *United States* v. *Skilling*
et al., No. 4:04–cr–00025 (SD Tex., Dec. 3, 2004), Record, Doc. 231,
pp. 21–28 (describing in depth the jury-selection process in the *Arthur
Andersen* and *Bayly* trials).

peremptories to exclude them had he not exhausted his supply by striking several venire members after the court refused to excuse them for cause. Supp. App. 3sa–4sa (Sealed).[7] The court overruled this objection.

After the jurors took their oath, the District Court told them they could not discuss the case with anyone or follow media accounts of the proceedings. "[E]ach of you," the court explained, "needs to be absolutely sure that your decisions concerning the facts will be based only on the evidence that you hear and read in this courtroom." App. 1026a.

Following a 4-month trial and nearly five days of delib-eration, the jury found Skilling guilty of 19 counts, includ-ing the honest-services-fraud conspiracy charge, and not guilty of 9 insider-trading counts. The District Court sentenced Skilling to 292 months' imprisonment, 3 years' supervised release, and $45 million in restitution.

On appeal, Skilling raised a host of challenges to his convictions, including the fair-trial and honest-services arguments he presses here. Regarding the former, the Fifth Circuit initially determined that the volume and negative tone of media coverage generated by Enron's collapse created a presumption of juror prejudice. 554 F. 3d 529, 559 (2009).[8] The court also noted potential

---

[7] Skilling had requested an additional peremptory strike each time the District Court rejected a for-cause objection. The court, which had already granted two extra peremptories, see *supra*, at 7, denied each request.

[8] The Fifth Circuit described the media coverage as follows:

"Local newspapers ran many personal interest stories in which sympathetic individuals expressed feelings of anger and betrayal toward Enron. . . . Even the [*Houston*] *Chronicle*'s sports page wrote of Skilling's guilt as a foregone conclusion. Similarly, the *Chronicle*'s 'Pethouse Pet of the Week' section mentioned that a *pet* had 'enjoyed watching those Enron jerks being led away in handcuffs.' These are but a few examples of the *Chronicle*'s coverage." 554 F. 3d, at 559 (footnote omitted).

prejudice stemming from Causey's guilty plea and from the large number of victims in Houston—from the "[t]housands of Enron employees . . . [who] lost their jobs, and . . . saw their 401(k) accounts wiped out," to Houstonians who suffered spillover economic effects. *Id.,* at 559–560.

The Court of Appeals stated, however, that "the presumption [of prejudice] is rebuttable," and it therefore examined the *voir dire* to determine whether "the District Court empanelled an impartial jury." *Id.,* at 561 (internal quotation marks, italics, and some capitalization omitted). The *voir dire* was, in the Fifth Circuit's view, "proper and thorough." *Id.,* at 562. Moreover, the court noted, Skilling had challenged only one seated juror—Juror 11—for cause. Although Juror 11 made some troubling comments about corporate greed, the District Court "observed [his] demeanor, listened to his answers, and believed he would make the government prove its case." *Id.,* at 564. In sum, the Fifth Circuit found that the Government had overcome the presumption of prejudice and that Skilling had not "show[n] that any juror who actually sat was prejudiced against him." *Ibid.*

The Court of Appeals also rejected Skilling's claim that his conduct did not indicate any conspiracy to commit honest-services fraud. "[T]he jury was entitled to convict Skilling," the court stated, "on these elements": "(1) a material breach of a fiduciary duty . . . (2) that results in a detriment to the employer," including one occasioned by an employee's decision to "withhold material information, i.e., information that he had reason to believe would lead a reasonable employer to change its conduct." *Id.,* at 547. The Fifth Circuit did not address Skilling's argument that the honest-services statute, if not interpreted to exclude his actions, should be invalidated as unconstitutionally vague. Brief of Defendant-Appellant Jeffrey K. Skilling in No. 06–20885 (CA5), p. 65, n. 21.

Arguing that the Fifth Circuit erred in its consideration of these claims, Skilling sought relief from this Court. We granted certiorari, 558 U. S. ___ (2009), and now affirm in part, vacate in part, and remand for further proceedings.[9] We consider first Skilling's allegation of juror prejudice, and next, his honest-services argument.

## II

Pointing to "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at him, Skilling argues that his trial "never should have proceeded in Houston." Brief for Petitioner 20. And even if it had been possible to select impartial jurors in Houston, "[t]he truncated voir dire . . . did almost nothing to weed out prejudices," he contends, so "[f]ar from rebutting the presumption of prejudice, the record below affirmatively confirmed it." *Id.,* at 21. Skilling's fair-trial claim thus raises two distinct questions. First, did the District Court err by failing to move the trial to a different venue based on a presumption of prejudice? Second, did actual prejudice contaminate Skilling's jury?[10]

### A

#### 1

The Sixth Amendment secures to criminal defendants

---

[9] We also granted certiorari and heard arguments this Term in two other cases raising questions concerning the honest-services statute's scope. See *Black* v. *United States*, No. 08–876; *Weyhrauch* v. *United States*, No. 08–1196. Today we vacate and remand those decisions in light of this opinion. *Black*, *post*, p. ___; *Weyhrauch*, *post*, p. ___.

[10] Assuming, as the Fifth Circuit found, that a presumption of prejudice arose in Houston, the question presented in Skilling's petition for certiorari casts his actual-prejudice argument as an inquiry into when, if ever, that presumption may be rebutted. See Pet. for Cert. i. Although we find a presumption of prejudice unwarranted in this case, we consider the actual-prejudice issue to be fairly subsumed within the question we agreed to decide. See this Court's Rule 14.1(a).

the right to trial by an impartial jury. By constitutional design, that trial occurs "in the State where the . . . Crimes . . . have been committed." Art. III, §2, cl. 3. See also Amdt. 6 (right to trial by "jury of the State and district wherein the crime shall have been committed"). The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a "basic requirement of due process," *In re Murchison*, 349 U. S. 133, 136 (1955).[11]

2

"The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influ-

_____

[11] Venue transfer in federal court is governed by Federal Rule of Criminal Procedure 21, which instructs that a "court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." As the language of the Rule suggests, district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect. See *Platt* v. *Minnesota Mining & Mfg. Co.*, 376 U. S. 240, 245 (1964). Federal courts have invoked the Rule to move certain highly charged cases, for example, the prosecution arising from the bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City. See *United States* v. *McVeigh*, 918 F. Supp. 1467, 1474 (WD Okla. 1996). They have also exercised discretion to deny venue-transfer requests in cases involving substantial pretrial publicity and community impact, for example, the prosecutions resulting from the 1993 World Trade Center bombing, see *United States* v. *Salameh*, No. S5 93 Cr. 0180 (KTD) (SDNY, Sept. 15, 1993); *United States* v. *Yousef*, No. S12 93 Cr. 180 (KTD) (SDNY, July 18, 1997), aff'd 327 F. 3d 56, 155 (CA2 2003), and the prosecution of John Walker Lindh, referred to in the press as the American Taliban, see *United States* v. *Lindh*, 212 F. Supp. 2d 541, 549–551 (ED Va. 2002). Skilling does not argue, distinct from his due process challenge, that the District Court abused its discretion under Rule 21 by declining to move his trial. We therefore review the District Court's venue-transfer decision only for compliance with the Constitution.

ence, whether of private talk or public print." *Patterson* v. *Colorado ex rel. Attorney General of Colo.*, 205 U. S. 454, 462 (1907) (opinion for the Court by Holmes, J.). When does the publicity attending conduct charged as criminal dim prospects that the trier can judge a case, as due process requires, impartially, unswayed by outside influence? Because most cases of consequence garner at least some pretrial publicity, courts have considered this question in diverse settings. We begin our discussion by addressing the presumption of prejudice from which the Fifth Circuit's analysis in Skilling's case proceeded. The foundation precedent is *Rideau* v. *Louisiana*, 373 U. S. 723 (1963).

Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession. Without informing Rideau, no less seeking his consent, the police filmed the interrogation. On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people. The trial court denied the motion, and a jury eventually convicted Rideau. The Supreme Court of Louisiana upheld the conviction.

We reversed. "What the people [in the community] saw on their television sets," we observed, "was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder." *Id.,* at 725. "[T]o the tens of thousands of people who saw and heard it," we explained, the interrogation "in a very real sense *was* Rideau's trial—at which he pleaded guilty." *Id.,* at 726. We therefore "d[id] not hesitate to hold, without pausing to examine a particularized tran-

script of the *voir dire*," that "[t]he kangaroo court proceedings" trailing the televised confession violated due process. *Id.,* at 726–727.

We followed *Rideau*'s lead in two later cases in which media coverage manifestly tainted a criminal prosecution. In *Estes* v. *Texas*, 381 U. S. 532, 538 (1965), extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and "bombard[ed] . . . the community with the sights and sounds of" the pretrial hearing. The media's overzealous reporting efforts, we observed, "led to considerable disruption" and denied the "judicial serenity and calm to which [Billie Sol Estes] was entitled." *Id.,* at 536.

Similarly, in *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities." *Id.,* at 353, 355. Pretrial media coverage, which we characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process, we noted. *Id.,* at 354. But Sheppard's case involved more than heated reporting pretrial: We upset the murder conviction because a "carnival atmosphere" pervaded the trial, *id.,* at 358.

In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process." *Murphy* v. *Florida*, 421 U. S. 794, 798–799 (1975).[12] See also, *e.g., Patton*

————————

[12] *Murphy* involved the robbery prosecution of the notorious Jack

v. *Yount*, 467 U. S. 1025 (1984).[13]   Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*.   *Irvin* v. *Dowd*, 366 U. S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds* v. *United States*, 98 U. S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some

_____

Murphy, a convicted murderer who helped mastermind the 1964 heist of the Star of India sapphire from New York's American Museum of Natural History.  Pointing to "extensive press coverage" about him, Murphy moved to transfer venue.  421 U. S., at 796.  The trial court denied the motion and a jury convicted Murphy.  We affirmed.  Murphy's trial, we explained, was markedly different from the proceedings at issue in *Rideau* v. *Louisiana*, 373 U. S. 723 (1963), *Estes* v. *Texas*, 381 U. S. 532 (1965), and *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), which "entirely lack[ed] . . . the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob."  421 U. S*.,* at 799.  *Voir dire* revealed no great hostility toward Murphy; "[s]ome of the jurors had a vague recollection of the robbery with which [he] was charged and each had some knowledge of [his] past crimes, but none betrayed any belief in the relevance of [his] past to the present case."  *Id.,* at 800 (footnote omitted).

[13] In *Yount*, the media reported on Jon Yount's confession to a brutal murder and his prior conviction for the crime, which had been reversed due to a violation of *Miranda* v. *Arizona*, 384 U. S. 436 (1966).  During *voir dire*, 77% of prospective jurors acknowledged they would carry an opinion into the jury box, and 8 of the 14 seated jurors and alternates admitted they had formed an opinion as to Yount's guilt.  467 U. S., at 1029–1030.  Nevertheless, we rejected Yount's presumption-of-prejudice claim.  The adverse publicity and community outrage, we noted, were at their height prior to Yount's first trial, four years before the second prosecution; time had helped "sooth[e] and eras[e]" community prejudice, *id.,* at 1034.

impression or some opinion in respect to its merits."). A presumption of prejudice, our decisions indicate, attends only the extreme case.

3

Relying on *Rideau*, *Estes*, and *Sheppard*, Skilling asserts that we need not pause to examine the screening questionnaires or the *voir dire* before declaring his jury's verdict void. We are not persuaded. Important differences separate Skilling's prosecution from those in which we have presumed juror prejudice.[14]

First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In *Rideau*, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling's trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. App. 627a. Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain. See *Mu'Min* v. *Virginia*, 500 U. S. 415, 429 (1991) (potential for prejudice mitigated by the size of the "metropolitan Washington [D. C.] statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year"); *Gentile* v. *State Bar of Nev.*, 501 U. S. 1030, 1044 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).[15]

--------

[14] Skilling's reliance on *Estes* and *Sheppard* is particularly misplaced; those cases involved media interference with courtroom proceedings *during* trial. See *supra*, at 14. Skilling does not assert that news coverage reached and influenced his jury after it was empaneled.

[15] According to a survey commissioned by Skilling in conjunction with his first motion for a venue change, only 12.3% of Houstonians named him when asked to list Enron executives they believed guilty of crimes.

Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. Cf. *Parker* v. *Randolph*, 442 U. S. 62, 72 (1979) (plurality opinion) ("[T]he defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." (internal quotation marks omitted)). Pretrial publicity about Skilling was less memorable and prejudicial. No evidence of the smoking-gun variety invited prejudgment of his culpability. See *United States* v. *Chagra*, 669 F. 2d 241, 251–252, n. 11 (CA5 1982) ("A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.").

Third, unlike cases in which trial swiftly followed a widely reported crime, *e.g., Rideau*, 373 U. S., at 724, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse. See App. 700a; *id.*, at 785a; *Yount*, 467 U. S., at 1032, 1034.

Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no over-

_____

App. 375a–376a. In response to the follow-up question "[w]hat words come to mind when you hear the name Jeff Skilling?", two-thirds of respondents failed to say a single negative word, *id.,* at 376a: 43% either had never heard of Skilling or stated that nothing came to mind when they heard his name, and another 23% knew Skilling's name was associated with Enron but reported no opinion about him, Record 3210–3211; see App. 417a–492a.

whelming victory for the Government.[16]  In *Rideau, Estes*,
and *Sheppard*, in marked contrast, the jury's verdict did
not undermine in any way the supposition of juror bias.  It
would be odd for an appellate court to presume prejudice
in a case in which jurors' actions run counter to that pre-
sumption.  See, *e.g., United States* v. *Arzola-Amaya*, 867
F. 2d 1504, 1514 (CA5 1989) ("The jury's ability to discern
a failure of proof of guilt of some of the alleged crimes
indicates a fair minded consideration of the issues and
reinforces our belief and conclusion that the media cover-
age did not lead to the deprivation of [the] right to an
impartial trial.").

4

Skilling's trial, in short, shares little in common with
those in which we approved a presumption of juror preju-
dice.  The Fifth Circuit reached the opposite conclusion
based primarily on the magnitude and negative tone of
media attention directed at Enron.  But "pretrial public-
ity—even pervasive, adverse publicity—does not inevita-
bly lead to an unfair trial."  *Nebraska Press Assn.* v. *Stu-
art*, 427 U. S. 539, 554 (1976).  In this case, as just noted,
news stories about Enron did not present the kind of vivid,
unforgettable information we have recognized as particu-
larly likely to produce prejudice, and Houston's size and
diversity diluted the media's impact.[17]

———————

[16] As the United States summarizes, "[i]n *Hirko*, the jury deliberated
for several days and did not convict any Enron defendant; in *Bayly*,
which was routinely described as 'the first Enron criminal trial,' the
jury convicted five defendants, . . . but acquitted a former Enron execu-
tive.  At the sentencing phase of *Bayly*, the jury found a loss amount of
slightly over $13 million, even though the government had argued that
the true loss . . . was $40 million."  Brief for United States 9–10 (cita-
tion omitted).

[17] The Fifth Circuit, moreover, did not separate media attention
aimed at Skilling from that devoted to Enron's downfall more generally.
Data submitted by Skilling in support of his first motion for a venue

Nor did Enron's "sheer number of victims," 554 F. 3d, at 560, trigger a presumption of prejudice. Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and follow-up *voir dire* were well suited to that task. And hindsight shows the efficacy of these devices; as we discuss *infra*, at 24, jurors' links to Enron were either nonexistent or attenuated.

Finally, although Causey's "well-publicized decision to plead guilty" shortly before trial created a danger of juror prejudice, 554 F. 3d, at 559, the District Court took appropriate steps to reduce that risk. The court delayed the proceedings by two weeks, lessening the immediacy of that development. And during *voir dire*, the court asked about prospective jurors' exposure to recent publicity, including news regarding Causey. Only two venire members recalled the plea; neither mentioned Causey by name, and neither ultimately served on Skilling's jury. App. 888a, 993a. Although publicity about a codefendant's guilty plea calls for inquiry to guard against actual prejudice, it does not ordinarily—and, we are satisfied, it did not here—warrant an automatic presumption of prejudice.

Persuaded that no presumption arose,[18] we conclude that the District Court, in declining to order a venue change, did not exceed constitutional limitations.[19]

————————

transfer suggested that a slim percentage of Enron-related stories specifically named him. App. 572a. "[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact." *United States* v. *Hueftle*, 687 F. 2d 1305, 1310 (CA10 1982).

[18] The parties disagree about whether a presumption of prejudice can be rebutted, and, if it can, what standard of proof governs that issue. Compare Brief for Petitioner 25–35 with Brief for United States 24–32, 35–36. Because we hold that no presumption arose, we need not, and do not, reach these questions.

[19] The dissent acknowledges that "the prospect of seating an unbiased

## B

We next consider whether actual prejudice infected Skilling's jury. *Voir dire*, Skilling asserts, did not adequately detect and defuse juror bias. "[T]he record . . . affirmatively confirm[s]" prejudice, he maintains, because several seated jurors "prejudged his guilt." Brief for Petitioner 21. We disagree with Skilling's characterization of the *voir dire* and the jurors selected through it.

### 1

No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*. See *United States* v. *Wood*, 299 U. S. 123, 145–146 (1936) ("Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."). Jury selection, we have repeatedly emphasized, is "particularly within the province of the trial judge." *Ristaino* v. *Ross*, 424 U. S. 589, 594–595 (1976) (internal quotation marks omitted); see, *e.g., Mu'Min*, 500 U. S., at 424; *Yount*, 467 U. S., at 1038; *Rosales-Lopez* v. *United States*, 451 U. S. 182, 188–189 (1981) (plurality opinion); *Connors* v. *United States*, 158 U. S. 408–413 (1895).

When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." *Mu'Min*, 500 U. S., at 427. Appellate courts making after-the-fact

——————

jury in Houston was not so remote as to compel the conclusion that the District Court acted unconstitutionally in denying Skilling's motion to change venue." *Post*, at 20. The dissent's conclusion that Skilling did not receive a fair trial accordingly turns on its perception of the adequacy of the jury-selection process.

assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.

Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. See *Reynolds*, 98 U. S., at 156–157. In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service. We consider the adequacy of jury selection in Skilling's case, therefore, attentive to the respect due to district-court determinations of juror impartiality and of the measures necessary to ensure that impartiality.[20]

_____

[20] The dissent recognizes "the 'wide discretion' owed to trial courts when it comes to jury-related issues," *post*, at 22 (quoting *Mu'Min* v. *Virginia*, 500 U. S. 415, 427 (1991)), but its analysis of the District Court's *voir dire* sometimes fails to demonstrate that awareness. For example, the dissent faults the District Court for not questioning prospective jurors regarding their "knowledge of or feelings about" Causey's guilty plea. *Post*, at 28. But the court could reasonably decline to ask direct questions involving Causey's plea to avoid tipping off until-that-moment uninformed venire members that the plea had occurred. Cf. App. 822a (counsel for Skilling urged District Court to find a way to question venire members about Causey "without mentioning anything"). Nothing inhibited defense counsel from inquiring about venire members' knowledge of the plea; indeed, counsel posed such a question, *id.*, at 993a; cf. *post*, at 28, n. 14 (acknowledging that counsel "squeeze[d] in" an inquiry whether a venire member had "read about any guilty pleas in this case over the last month or two" (internal quotation marks omitted)). From this Court's lofty and "panoramic" vantage point, *post*, at 22, lines of *voir dire* inquiry that "might be helpful in assessing whether a juror is impartial" are not hard to conceive. *Mu'Min*, 500 U. S., at 425. "To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather,

2

Skilling deems the *voir dire* insufficient because, he argues, jury selection lasted "just five hours," "[m]ost of the court's questions were conclusory[,] high-level, and failed adequately to probe jurors' true feelings," and the court "consistently took prospective jurors at their word once they claimed they could be fair, no matter what other indications of bias were present." Brief for Petitioner 10–11 (emphasis deleted). Our review of the record, however, yields a different appraisal.[21]

As noted, *supra,* at 4–6, and n. 4, the District Court initially screened venire members by eliciting their responses to a comprehensive questionnaire drafted in large part by Skilling. That survey helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array. *Voir dire* thus was, in the court's words, the "culmination of a lengthy process." App. 841a; see 554 F. 3d, at 562, n. 51 ("We consider the . . . questionnaire in

_____

the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Id.,* at 425–426. According appropriate deference to the District Court, we cannot characterize jury-selection in this case as fundamentally unfair. Cf. *supra,* at 8, n. 6 (same selection process was used in other Enron-related prosecutions).

[21] In addition to focusing on the adequacy of *voir dire,* our decisions have also "take[n] into account . . . other measures [that] were used to mitigate the adverse effects of publicity." *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 565 (1976). We have noted, for example, the prophylactic effect of "emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court." *Id.,* at 564. Here, the District Court's instructions were unequivocal; the jurors, the court emphasized, were duty bound "to reach a fair and impartial verdict in this case based solely on the evidence [they] hear[d] and read in th[e] courtroom." App. 1026a. Peremptory challenges, too, "provid[e] protection against [prejudice]," *United States ex rel. Darcy* v. *Handy,* 351 U. S. 454, 462 (1956); the District Court, as earlier noted, exercised its discretion to grant the defendants two extra peremptories, App. 1020a; see *supra,* at 7.

assessing the quality of *voir dire* as a whole.").[22]  In other Enron-related prosecutions, we note, District Courts, after inspecting venire members' responses to questionnaires, completed the jury-selection process within one day.  See *supra*, at 8, n. 6.[23]

The District Court conducted *voir dire*, moreover, aware of the greater-than-normal need, due to pretrial publicity, to ensure against jury bias.  At Skilling's urging, the court examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members.  See *Mu'Min*, 500 U. S., at 425.  To encourage candor, the court repeatedly admonished that there were "no right and wrong answers to th[e] questions."  *E.g.,* App. 843a.  The court denied Skilling's request for attorney-led *voir dire* because, in its experience, potential jurors were "more forthcoming" when the court, rather than counsel, asked the question.  Record 11805.  The parties, however, were accorded an opportunity to ask follow-up questions of every prospective juror brought to

_____

[22]The dissent's analysis undervalues the 77-item questionnaire, a part of the selection process difficult to portray as "cursory," *post*, at 30, or "anemic," *post*, at 35.  Notably, the "open-ended questions about [prospective jurors'] impressions of Enron or Skilling" that the dissent contends should have been asked, *post*, at 30, *were* asked—on the questionnaire, see *supra*, at 5–6, n. 4.  Moreover, the District Court gave Skilling's counsel relatively free rein to ask venire members about their responses on the questionnaire.  See, *e.g.,* App. 869a–870a; *id.,* at 878a, 911a, 953a.  The questionnaire plus follow-up opportunity to interrogate potential jurors surely gave Skilling's counsel "clear avenue[s] for . . . permissible inquiry."  But see *post*, at 31, n. 17.  See also App. 967a (counsel for Skilling) ("Judge, for the record, if I don't ask any questions, it's because the Court and other counsel have covered it.").

[23] One of the earlier prosecutions targeted the "Big Five" public accounting firm Arthur Andersen.  See *supra*, at 8, n. 6.  Among media readers and auditors, the name and reputation of Arthur Andersen likely sparked no less attention than the name and reputation of Jeffrey Skilling.  Cf. *supra*, at 16–17, n. 15.

the bench for colloquy. Skilling's counsel declined to ask anything of more than half of the venire members questioned individually, including eight eventually selected for the jury, because, he explained, "the Court and other counsel have covered" everything he wanted to know. App. 967a.

Inspection of the questionnaires and *voir dire* of the individuals who actually served as jurors satisfies us that, notwithstanding the flaws Skilling lists, the selection process successfully secured jurors who were largely untouched by Enron's collapse.[24] Eleven of the seated jurors and alternates reported no connection at all to Enron, while all other jurors reported at most an insubstantial link. See, *e.g.*, Supp. App. 101sa (Juror 63) ("I once met a guy who worked for Enron. I cannot remember his name.").[25] As for pretrial publicity, 14 jurors and alternates specifically stated that they had paid scant attention to Enron-related news. See, *e.g.,* App. 859a–860a (Juror

_____

[24] In considering whether Skilling was tried before an impartial jury, the dissent relies extensively on venire members *not* selected for that jury. See, *e.g.*, *post*, at 6, n. 4 (quoting the questionnaires of ten venire members; all were excused for cause before *voir dire* commenced, see Record 11891); *post*, at 7, n. 6 (quoting the questionnaires of 15 venire members; none sat on Skilling's jury); *post*, at 10–11, n. 7 (quoting *voir dire* testimony of six venire members; none sat on Skilling's jury); *post*, at 28–34 (reporting at length *voir dire* testimony of Venire Members 17, 29, 61, 74, 75, and 101; none sat on Skilling's jury). Statements by nonjurors do not themselves call into question the adequacy of the jury-selection process; elimination of these venire members is indeed one indicator that the process fulfilled its function. Critically, as discussed *infra*, at 24–26, the seated jurors showed little knowledge of or interest in, and were personally unaffected by, Enron's downfall.

[25] See also Supp. App. 11sa (Juror 10) ("knew some casual co-workers that owned Enron stock"); *id.,* at 26sa (Juror 11) ("work[s] with someone who worked at Enron"); *id.,* at 117sa; App. 940a (Juror 64) (two acquaintances lost money due to Enron's collapse); Supp. App. 236sa (Juror 116) (work colleague lost money as a result of Enron's bankruptcy).

13) (would "[b]asically" start out knowing nothing about the case because "I just . . . didn't follow [it] a whole lot"); *id.,* at 969a (Juror 78) ("[Enron] wasn't anything that I was interested in reading [about] in detail. . . . I don't really know much about it.").[26] The remaining two jurors indicated that nothing in the news influenced their opinions about Skilling.[27]

The questionnaires confirmed that, whatever community prejudice existed in Houston generally, Skilling's jurors were not under its sway.[28] Although many ex-

---

[26] See also App. 850a (Juror 10) ("I haven't followed [Enron-related news] in detail or to any extreme at all."); *id.,* at 856a (Juror 11) (did not "get into the details of [the Enron case]" and "just kind of tune[d] [it] out"); *id.,* at 873a (Juror 20) ("I was out of [the] state when [Enron collapsed], and then personal circumstances kept me from paying much attention."); *id.,* at 892a (Juror 38) (recalled "nothing in particular" about media coverage); *id.,* at 913a (Juror 50) ("I would hear it on the news and just let it filter in and out."); *id.,* at 935a (Juror 63) ("I don't really pay attention."); *id.,* at 940a–941a (Juror 64) (had "[n]ot really" been keeping up with and did not recall any news about Enron); *id.,* at 971a (Juror 84) (had not read "anything at all about Enron" because he did not "want to read that stuff" (internal quotation marks omitted)); *id.,* at 983a (Juror 90) ("seldom" read the Houston Chronicle and did not watch news programs); *id*., at 995a–996a (Juror 99) (did not read newspapers or watch the news; "I don't know the details on what [this case] is or what made it what it is"); *id.,* at 1010a (Juror 113) ("never really paid that much attention [to] it"); *id.,* at 1013a (Juror 116) (had "rea[d] a number of different articles," but "since it hasn't affected me personally," could not "specifically recall" any of them).

[27] *Id.,* at 944a (Juror 67) (had not read the Houston Chronicle in the three months preceding the trial and volunteered: "I don't form an opinion based on what . . . I hear on the news"); *id.,* at 974a–975a (Juror 87) (had not "formed any opinions" about Skilling's guilt from news stories).

[28] As the D. C. Circuit observed, reviewing the impact on jurors of media coverage of the Watergate scandal, "[t]his may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally." *United States* v. *Haldeman*, 559 F. 2d 31, 62–63, n. 37 (1976). See also *In re Charlotte Observer*, 882 F. 2d 850, 855–856 (CA4 1989)

pressed sympathy for victims of Enron's bankruptcy and speculated that greed contributed to the corporation's collapse, these sentiments did not translate into animus toward Skilling.  When asked whether they "ha[d] an opinion about . . . Jeffrey Skilling," none of the seated jurors and alternates checked the "yes" box.[29]  And in response to the question whether "any opinion [they] may have formed regarding Enron or [Skilling] [would] prevent" their impartial consideration of the evidence at trial, every juror—despite options to mark "yes" or "unsure"— instead checked "no."

The District Court, Skilling asserts, should not have "accept[ed] *at face value* jurors' promises of fairness." Brief for Petitioner 37.  In *Irvin* v. *Dowd*, 366 U. S., at 727–728, Skilling points out, we found actual prejudice despite jurors' assurances that they could be impartial. Brief for Petitioner 26.  JUSTICE SOTOMAYOR, in turn, repeatedly relies on *Irvin*, which she regards as closely analogous to this case.  See *post*, at 23 (opinion concurring in part and dissenting in part) (hereinafter dissent).  See also, *e.g., post*, at 15–16, 33, 35, 39–40.  We disagree with that characterization of *Irvin*.

The facts of *Irvin* are worlds apart from those presented

---

("[R]emarkably in the eyes of many," "[c]ases such as those involving the Watergate defendants, the Abscam defendants, and . . . John DeLorean, all characterized by massive pretrial media reportage and commentary, nevertheless proceeded to trial with juries which . . . were satisfactorily disclosed to have been unaffected (indeed, in some instances blissfully unaware of or untouched) by that publicity."); Brief for ABC, Inc., et al. as *Amici Curiae* 25–31 (describing other examples).

[29] One juror did not check any box, explaining that she lived in another State when Enron went bankrupt and therefore "was not fully aware of all the facts regarding Enron's fall [and] the media coverage." Supp. App. 62sa (Juror 20).  Two other jurors, Juror 10 and Juror 63, indicated in answer to a different question that they had an opinion about Skilling's guilt, but *voir dire* established they could be impartial. See *infra*, at 32–34, and n. 34.

here. Leslie Irvin stood accused of a brutal murder and robbery spree in a small rural community. 366 U. S., at 719. In the months before Irvin's trial, "a barrage" of publicity was "unleashed against him," including reports of his confessions to the slayings and robberies. *Id.,* at 725–726. This Court's description of the media coverage in *Irvin* reveals why the dissent's "best case" is not an apt comparison:

> "[S]tories revealed the details of [Irvin's] background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but [he] refused to confess. Finally, they announced [Irvin's] confession to the six murders and the fact of his indictment for four of them in Indiana. They reported [Irvin's] offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that [Irvin] had confessed to 24 burglaries (the *modus operandi* of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing [Irvin's] execution . . . . Another characterized [Irvin] as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories [Irvin] was described as the 'confessed slayer of six,' a parole violator and fraudulent-check artist. [Irvin's] court-appointed counsel was quoted as having received 'much criticism over being Irvin's counsel' and it was pointed out, by

way of excusing the attorney, that he would be subject
to disbarment should he refuse to represent Irvin. On
the day before the trial the newspapers carried the
story that Irvin had orally admitted [to] the murder of
[one victim] as well as 'the robbery-murder of [a sec-
ond individual]; the murder of [a third individual],
and the slaughter of three members of [a different
family].'" *Id.*, at 725–726.

"[N]ewspapers in which the[se] stories appeared were
delivered regularly to 95% of the dwellings in" the county
where the trial occurred, which had a population of only
30,000; "radio and TV stations, which likewise blanketed
that county, also carried extensive newscasts covering the
same incidents." *Id.*, at 725.

Reviewing Irvin's fair-trial claim, this Court noted that
"the pattern of deep and bitter prejudice" in the commu-
nity "was clearly reflected in the sum total of the *voir
dire*": "370 prospective jurors or almost 90% of those exam-
ined on the point . . . entertained some opinion as to guilt,"
and "[8] out of the 12 [jurors] thought [Irvin] was guilty."
*Id.,* at 727 (internal quotation marks omitted). Although
these jurors declared they could be impartial, we held
that, "[w]ith his life at stake, it is not requiring too much
that [Irvin] be tried in an atmosphere undisturbed by so
huge a wave of public passion and by a jury other than one
in which two-thirds of the members admit, before hearing
any testimony, to possessing a belief in his guilt." *Id.*, at
728.

In this case, as noted, *supra*, at 17, news stories about
Enron contained nothing resembling the horrifying infor-
mation rife in reports about Irvin's rampage of robberies
and murders. Of key importance, Houston shares little in
common with the rural community in which Irvin's trial
proceeded, and circulation figures for Houston media
sources were far lower than the 95% saturation level

recorded in *Irvin*, see App. to Brief for United States 15a
("The *Houston Chronicle* . . . reaches less than one-third of
occupied households in Houston." (internal quotation
marks omitted)). Skilling's seated jurors, moreover, exhib-
ited nothing like the display of bias shown in *Irvin*. See
*supra*, at 24–26 (noting, *inter alia*, that none of Skilling's
jurors answered "yes" when asked if they "ha[d] an opinion
about . . . Skilling"). See also *post*, at 19 (dissent) (distin-
guishing *Mu'Min* from *Irvin* on similar bases: the "offense
occurred in [a large] metropolitan . . . area," media "cover-
age was not as pervasive as in *Irvin* and did not contain
the same sort of damaging information," and "the seated
jurors uniformly disclaimed having ever formed an opinion
about the case" (internal quotation marks omitted)). In
light of these large differences, the District Court had far
less reason than did the trial court in *Irvin* to discredit
jurors' promises of fairness.

The District Court, moreover, did not simply take venire
members who proclaimed their impartiality at their
word.[30] As noted, all of Skilling's jurors had already af-
firmed on their questionnaires that they would have no
trouble basing a verdict only on the evidence at trial.
Nevertheless, the court followed up with each individually
to uncover concealed bias. This face-to-face opportunity to
gauge demeanor and credibility, coupled with information
from the questionnaires regarding jurors' backgrounds,
opinions, and sources of news, gave the court a sturdy
foundation to assess fitness for jury service. See 554 F. 3d,
at 562 (The District Court made "thorough" credibility
determinations that "requir[ed] more than just the [venire

--------

[30] The court viewed with skepticism, for example, Venire Member
104's promises that she could "abide by law," follow the court's instruc-
tions, and find Skilling not guilty if the Government did not prove its
case, App. 1004a; "I have to gauge . . . demeanor, all the answers she
gave me," the court stated, and "[s]he persuaded me that she could not
be fair and impartial, so she's excused," *id.,* at 1006a.

members'] statements that [they] could be fair."). The jury's not-guilty verdict on nine insider-trading counts after nearly five days of deliberation, meanwhile, suggests the court's assessments were accurate. See *United States* v. *Haldeman*, 559 F. 2d 31, 60, n. 28 (CADC 1976).[31] Skilling, we conclude, failed to show that his *voir dire* fell short of constitutional requirements.[32]

———————

[31] The dissent asserts that "the Government placed relatively little emphasis on [these] insider trading counts during its closing argument." *Post,* at 39. As the record shows, however, counsel described in detail the evidence supporting Count 50, one of the insider-trading counts on which the jury returned a not-guilty verdict. See Record 37008–37010. Skilling, Government counsel asserted, sold "half of his stock" based on "material inside information" and then lied in testimony before the Securities and Exchange Commission (SEC) by claiming the "only reason [he] sold Enron stock was because of [the] September 11th [terrorist attacks]." *Id.,* at 37009 (internal quotation marks omitted). As counsel summarized: "Mr. Skilling used our nation's tragedy to cover his tracks. . . . I'd suggest . . . the reason he was lying is because he didn't want [the SEC] to know that he had done it before. . . . [T]hat's Count 50. That's proof beyond a reasonable doubt." *Id.*, at 37010. Regarding the remaining insider-trading counts, counsel reminded jurors they had heard similar evidence of Skilling's other sales, and urged them to "conclude, based on the evidence," that "Skilling had information that he used to sell his stock" at the "key periods in time." *Ibid.*

[32] Skilling emphasizes that *voir dire* did not weed out every juror who suffered from Enron's collapse because the District Court failed to grant his for-cause challenge to Venire Member 29, whose retirement fund lost $50,000 due to ripple effects from the decline in the value of Enron stock. App. 880a. Critically, however, Venire Member 29 *did not sit on Skilling's jury*: Instead, Skilling struck her using a peremptory challenge. "[I]f [a] defendant elects to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat," we have held, "he has not been deprived of any . . . constitutional right." *United States* v. *Martinez-Salazar*, 528 U. S. 304, 307 (2000). Indeed, the "use [of] a peremptory challenge to effect an instantaneous cure of the error" exemplifies "a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury." *Id.,* at 316.

3

Skilling also singles out several jurors in particular and contends they were openly biased. See *United States* v. *Martinez-Salazar*, 528 U. S. 304, 316 (2000) ("[T]he seating of any juror who should have been dismissed for cause . . . require[s] reversal."). In reviewing claims of this type, the deference due to district courts is at its pinnacle: "A trial court's findings of juror impartiality may be overturned only for manifest error." *Mu'Min*, 500 U. S., at 428 (internal quotation marks omitted). Skilling, moreover, unsuccessfully challenged only one of the seated jurors for cause, "strong evidence that he was convinced the [other] jurors were not biased and had not formed any opinions as to his guilt." *Beck* v. *Washington*, 369 U. S. 541, 557–558 (1962). With these considerations in mind, we turn to Skilling's specific allegations of juror partiality.

Skilling contends that Juror 11—the only seated juror he challenged for cause—"expressed the most obvious bias." Brief for Petitioner 35. See also *post*, at 36 (dissent). Juror 11 stated that "greed on Enron's part" triggered the company's bankruptcy and that corporate executives, driven by avarice, "walk a line that stretches sometimes the legality of something." App. 854a–855a. But, as the Fifth Circuit accurately summarized, Juror 11

> "had 'no idea' whether Skilling had 'crossed that line,' and he 'didn't say that' every CEO is probably a crook. He also asserted that he could be fair and require the government to prove its case, that he did not believe everything he read in the paper, that he did not 'get into the details' of the Enron coverage, that he did not watch television, and that Enron was 'old news.'" 554 F. 3d, at 563–564.

Despite his criticism of greed, Juror 11 remarked that Skilling "earned [his] salar[y]," App. 857a, and said he would have "no problem" telling his co-worker, who had

lost 401(k) funds due to Enron's collapse, that the jury
voted to acquit, if that scenario came to pass, *id.,* at 854a.
The District Court, noting that it had "looked [Juror 11] in
the eye and . . . heard all his [answers]," found his asser-
tions of impartiality credible. *Id.*, at 858a; cf. *supra*, at 29,
n. 30. We agree with the Court of Appeals that "[t]he
express finding that Juror 11 was fair is not reversible
error." 554 F. 3d, at 564.[33]

Skilling also objected at trial to the seating of six spe-
cific jurors whom, he said, he would have excluded had he
not already exhausted his peremptory challenges. See
*supra*, at 8–9. Juror 20, he observes, "said she was 'angry'
about Enron's collapse and that she, too, had been 'forced
to forfeit [her] own 401(k) funds to survive layoffs.'" Reply
Brief 13. But Juror 20 made clear during *voir dire* that
she did not "personally blame" Skilling for the loss of her
retirement account. App. 875a. Having not "pa[id] much
attention" to Enron-related news, she "quite honestly" did
not "have enough information to know" whether Skilling
was probably guilty, *id.,* at 873a, and she "th[ought] [she]
could be" fair and impartial, *id.,* at 875a. In light of these
answers, the District Court did not commit manifest error
in finding Juror 20 fit for jury service.

The same is true of Juror 63, who, Skilling points out,
wrote on her questionnaire "that [Skilling] 'probably knew
[he] w[as] breaking the law.'" Reply Brief 13. During *voir
dire*, however, Juror 63 insisted that she did not "really
have an opinion [about Skilling's guilt] either way," App.
936a; she did not "know what [she] was thinking" when
she completed the questionnaire, but she "absolutely"
presumed Skilling innocent and confirmed her under-
standing that the Government would "have to prove" his

---

[33] Skilling's trial counsel and jury consultants apparently did not
regard Juror 11 as so "obvious[ly] bias[ed]," Brief for Petitioner 35, as to
warrant exercise of a peremptory challenge.

guilt, *id.,* at 937a. In response to follow-up questions from Skilling's counsel, she again stated she would not presume that Skilling violated any laws and could "[a]bsolutely" give her word that she could be fair. *Id.,* at 937a–938a. "Jurors," we have recognized, "cannot be expected invariably to express themselves carefully or even consistently." *Yount*, 467 U. S., at 1039. See also *id.,* at 1040 ("It is here that the federal [appellate] court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty."). From where we sit, we cannot conclude that Juror 63 was biased.

The four remaining jurors Skilling said he would have excluded with extra peremptory strikes exhibited no sign of prejudice we can discern. See App. 891a–892a (Juror 38) (remembered no media coverage about Enron and said nothing in her experience would prevent her from being fair and impartial); Supp. App. 131sa–133sa, 136sa (Juror 67) (had no connection to Enron and no anger about its collapse); App. 969a (Juror 78) (did not "know much about" Enron); Supp. App. 165sa, App. 971a (Juror 84) (had not heard or read anything about Enron and said she did not "know enough to answer" the question whether she was angry about the company's demise). Skilling's counsel declined to ask follow-up questions of any of these jurors and, indeed, told Juror 84 he had nothing to ask because she "gave all the right answers." *Id.,* at 972a. Whatever Skilling's reasons for wanting to strike these four individuals from his jury, he cannot credibly assert they displayed a disqualifying bias.[34]

————

[34] Although Skilling raised no objection to Juror 10 and Juror 87 at trial, his briefs in this Court impugn their impartiality. Brief for Petitioner 14–15; Reply Brief 13. Even if we allowed these tardy pleas, the *voir dire* testimony of the two jurors gives sufficient assurance that they were unbiased. See, *e.g.,* App. 850a–853a (Juror 10) (did not prejudge Skilling's guilt, indicated he could follow the court's instruc-

In sum, Skilling failed to establish that a presumption of prejudice arose or that actual bias infected the jury that tried him. Jurors, the trial court correctly comprehended, need not enter the box with empty heads in order to determine the facts impartially. "It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Irvin*, 366 U. S., at 723. Taking account of the full record, rather than incomplete exchanges selectively culled from it, we find no cause to upset the lower courts' judgment that Skilling's jury met that measure. We therefore affirm the Fifth Circuit's ruling that Skilling received a fair trial.[35]

## III

We next consider whether Skilling's conspiracy conviction was premised on an improper theory of honest-services wire fraud. The honest-services statute, §1346, Skilling maintains, is unconstitutionally vague. Alternatively, he contends that his conduct does not fall within the statute's compass.

## A

To place Skilling's constitutional challenge in context, we first review the origin and subsequent application of

—————

tions and make the Government prove its case, stated he could be fair to Skilling, and said he would "judge on the facts"); *id.,* at 974a (Juror 87) (had "not formed an opinion" on whether Skilling was guilty and affirmed she could adhere to the presumption of innocence).

[35] Our decisions have rightly set a high bar for allegations of juror prejudice due to pretrial publicity. See, *e.g., Mu'Min*, 500 U. S. 415; *Patton* v. *Yount*, 467 U. S. 1025 (1984); *Murphy* v. *Florida*, 421 U. S. 794 (1975). News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented. Trial judges generally take care so to instruct jurors, and the District Court did just that in this case. App. 1026a.

the honest-services doctrine.

1

Enacted in 1872, the original mail-fraud provision, the predecessor of the modern-day mail- and wire-fraud laws, proscribed, without further elaboration, use of the mails to advance "any scheme or artifice to defraud."  See *McNally* v. *United States*, 483 U. S. 350, 356 (1987).  In 1909, Congress amended the statute to prohibit, as it does today, "any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.*"  §1341 (emphasis added); see *id.*, at 357–358.  Emphasizing Congress' disjunctive phrasing, the Courts of Appeals, one after the other, interpreted the term "scheme or artifice to defraud" to include deprivations not only of money or property, but also of intangible rights.

In an opinion credited with first presenting the intangible-rights theory, *Shushan* v. *United States*, 117 F. 2d 110 (1941), the Fifth Circuit reviewed the mail-fraud prosecution of a public official who allegedly accepted bribes from entrepreneurs in exchange for urging city action beneficial to the bribe payers.  "It is not true that because the [city] was to make and did make a saving by the operations there could not have been an intent to defraud," the Court of Appeals maintained.  *Id.,* at 119.  "A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official," the court observed, "would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public." *Id.,* at 115.

The Fifth Circuit's opinion in *Shushan* stimulated the development of an "honest-services" doctrine.  Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, see, *e.g., United States* v. *Starr*, 816 F. 2d 94,

101 (CA2 1987), the honest-services theory targeted cor-
ruption that lacked similar symmetry. While the offender
profited, the betrayed party suffered no deprivation of
money or property; instead, a third party, who had not
been deceived, provided the enrichment. For example, if a
city mayor (the offender) accepted a bribe from a third
party in exchange for awarding that party a city contract,
yet the contract terms were the same as any that could
have been negotiated at arm's length, the city (the be-
trayed party) would suffer no tangible loss. Cf. *McNally*,
483 U. S., at 360. Even if the scheme occasioned a money
or property *gain* for the betrayed party, courts reasoned,
actionable harm lay in the denial of that party's right to
the offender's "honest services." See, *e.g., United States* v.
*Dixon*, 536 F. 2d 1388, 1400 (CA2 1976).

"Most often these cases . . . involved bribery of public
officials," *United States* v. *Bohonus*, 628 F. 2d 1167, 1171
(CA9 1980), but courts also recognized private-sector
honest-services fraud. In perhaps the earliest application
of the theory to private actors, a District Court, reviewing
a bribery scheme, explained:

> "When one tampers with [the employer-employee] re-
> lationship for the purpose of causing the employee to
> breach his duty [to his employer,] he in effect is de-
> frauding the employer of a lawful right. The actual
> deception that is practised is in the continued repre-
> sentation of the employee to the employer that he is
> honest and loyal to the employer's interests." *United
> States* v. *Procter & Gamble Co.*, 47 F. Supp. 676, 678
> (Mass. 1942).

Over time, "[a]n increasing number of courts" recognized
that "a recreant employee"—public or private—"c[ould] be
prosecuted under [the mail-fraud statute] if he breache[d]
his allegiance to his employer by accepting bribes or kick-
backs in the course of his employment," *United States* v.

*McNeive*, 536 F. 2d 1245, 1249 (CA8 1976); by 1982, all Courts of Appeals had embraced the honest-services theory of fraud, Hurson, Limiting the Federal Mail Fraud Statute—A Legislative Approach, 20 Am. Crim. L. Rev. 423, 456 (1983).[36]

2

In 1987, this Court, in *McNally* v. *United States*, stopped the development of the intangible-rights doctrine in its tracks. *McNally* involved a state officer who, in selecting Kentucky's insurance agent, arranged to procure a share of the agent's commissions via kickbacks paid to companies the official partially controlled. 483 U. S., at 360. The prosecutor did not charge that, "in the absence of the alleged scheme[,] the Commonwealth would have paid a lower premium or secured better insurance." *Ibid.* Instead, the prosecutor maintained that the kickback scheme "defraud[ed] the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly." *Id.,* at 353.

We held that the scheme did not qualify as mail fraud. "Rather than constru[ing] the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," we read the statute "as limited in scope to the protection of property rights." *Id.*, at 360. "If Congress desires to go further," we stated, "it must speak more clearly." *Ibid.*

_____

[36] In addition to upholding honest-services prosecutions, courts also increasingly approved use of the mail-fraud statute to attack corruption that deprived victims of other kinds of intangible rights, including election fraud and privacy violations. See, *e.g., Cleveland* v. *United States*, 531 U. S. 12, 18, n. 2 (2000); *McNally* v. *United States*, 483 U. S. 350, 362–364, and nn. 1–4 (1987) (STEVENS, J., dissenting).

### 3

Congress responded swiftly. The following year, it enacted a new statute "specifically to cover one of the 'intangible rights' that lower courts had protected . . . prior to *McNally:* 'the intangible right of honest services.'" *Cleveland* v. *United States*, 531 U. S. 12, 19–20 (2000). In full, the honest-services statute stated:

> "For the purposes of th[e] chapter [of the United States Code that prohibits, *inter alia*, mail fraud, §1341, and wire fraud, §1343], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." §1346.

### B

Congress, Skilling charges, reacted quickly but not clearly: He asserts that §1346 is unconstitutionally vague. To satisfy due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U. S. 352, 357 (1983). The void-for-vagueness doctrine embraces these requirements.

According to Skilling, §1346 meets neither of the two due process essentials. First, the phrase "the intangible right of honest services," he contends, does not adequately define what behavior it bars. Brief for Petitioner 38–39. Second, he alleges, §1346's "standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections," thereby "facilitat[ing] opportunistic and arbitrary prosecutions." *Id.,* at 44 (quoting *Kolender*, 461 U. S., at 358).

In urging invalidation of §1346, Skilling swims against our case law's current, which requires us, if we can, to construe, not condemn, Congress' enactments. See, *e.g.,*

*Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 571 (1973). See also *United States* v. *National Dairy Products Corp.*, 372 U. S. 29, 32 (1963) (stressing, in response to a vagueness challenge, "[t]he strong presumptive validity that attaches to an Act of Congress"). Alert to §1346's potential breadth, the Courts of Appeals have divided on how best to interpret the statute.[37] Uniformly, however, they have declined to throw out the statute as irremediably vague.[38]

We agree that §1346 should be construed rather than invalidated. First, we look to the doctrine developed in pre-*McNally* cases in an endeavor to ascertain the meaning of the phrase "the intangible right of honest services." Second, to preserve what Congress certainly intended the statute to cover, we pare that body of precedent down to its core: In the main, the pre-*McNally* cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived. Confined to these paramount

---

[37] Courts have disagreed about whether §1346 prosecutions must be based on a violation of state law, compare, *e.g., United States* v. *Brumley*, 116 F. 3d 728, 734–735 (CA5 1997) (en banc), with, *e.g., United States* v. *Weyhrauch*, 548 F. 3d 1237, 1245–1246 (CA9 2008), vacated and remanded, *post*, p. \_\_\_; whether a defendant must contemplate that the victim suffer economic harm, compare, *e.g., United States* v. *Sun-Diamond Growers of Cal.*, 138 F. 3d 961, 973 (CADC 1998), with, *e.g., United States* v. *Black*, 530 F. 3d 596, 600–602 (CA7 2008), vacated and remanded, *post*, p. \_\_\_; and whether the defendant must act in pursuit of private gain, compare, *e.g., United States* v. *Bloom*, 149 F. 3d 649, 655 (CA7 1998), with, *e.g., United States* v. *Panarella*, 277 F. 3d 678, 692 (CA3 2002).

[38] See, *e.g., United States* v. *Rybicki*, 354 F. 3d 124, 132 (CA2 2003) (en banc); *United States* v. *Hausmann*, 345 F. 3d 952, 958 (CA7 2003); *United States* v. *Welch*, 327 F. 3d 1081, 1109, n. 29 (CA10 2003); *United States* v. *Frega*, 179 F. 3d 793, 803 (CA9 1999); *Brumley*, 116 F. 3d, at 732–733; *United States* v. *Frost*, 125 F. 3d 346, 370–372 (CA6 1997); *United States* v. *Waymer*, 55 F. 3d 564, 568–569 (CA11 1995); *United States* v. *Bryan*, 58 F. 3d 933, 941 (CA4 1995).

applications, §1346 presents no vagueness problem.

1

There is no doubt that Congress intended §1346 to refer to and incorporate the honest-services doctrine recognized in Court of Appeals' decisions before *McNally* derailed the intangible-rights theory of fraud. See Brief for Petitioner 39; Brief for United States 37–38; *post*, at 2, 8 (SCALIA, J., concurring in part and concurring in judgment). Congress enacted §1346 on the heels of *McNally* and drafted the statute using that decision's terminology. See 483 U. S., at 355 ("intangible righ[t]"); *id.,* at 362 (STEVENS, J., dissenting) ("right to . . . honest services").[39] As the Second Circuit observed in its leading analysis of §1346:

> "The definite article 'the' suggests that 'intangible right of honest services' had a specific meaning to Congress when it enacted the statute—Congress was recriminalizing mail- and wire-fraud schemes to deprive others of *that* 'intangible right of honest services,' which had been protected before *McNally*, not *all* intangible rights of honest services whatever they might be thought to be." *United States* v. *Rybicki*, 354 F. 3d 124, 137–138 (2003) (en banc).[40]

---

[39] Although verbal formulations varied slightly, the words employed by the Courts of Appeals prior to *McNally* described the same concept: "honest services," *e.g., United States* v. *Bruno*, 809 F. 2d 1097, 1105 (CA5 1987); "honest and faithful services," *e.g., United States* v. *Brown*, 540 F. 2d 364, 374 (CA8 1976); and "faithful and honest services," *e.g., United States* v. *Diggs*, 613 F. 2d 988, 998 (CADC 1979).

[40] We considered a similar Court-Congress interplay in *McDermott Int'l, Inc.* v. *Wilander*, 498 U. S. 337 (1991), which involved the interpretation of the term "seaman" in the Jones Act, 46 U. S. C. App. §688 (2000 ed.). The Act, we recognized, "respond[ed] directly to" our decision in *The Osceola*, 189 U. S. 158 (1903), and "adopt[ed] without further elaboration the term used in" that case, so we "assume[d] that the Jones Act use[d] 'seaman' in the same way." 498 U. S., at 342.

2

Satisfied that Congress, by enacting §1346, "meant to reinstate the body of pre-*McNally* honest-services law," *post*, at 8 (opinion of SCALIA, J.), we have surveyed that case law. See *infra*, at 43–44, 46. In parsing the Courts of Appeals decisions, we acknowledge that Skilling's vagueness challenge has force, for honest-services decisions preceding *McNally* were not models of clarity or consistency. See Brief for Petitioner 39–42 (describing divisions of opinions). See also *post*, at 3–7 (opinion of SCALIA, J.). While the honest-services cases preceding *McNally* dominantly and consistently applied the fraud statute to bribery and kickback schemes—schemes that were the basis of most honest-services prosecutions—there was considerable disarray over the statute's application to conduct outside that core category. In light of this disarray, Skilling urges us, as he urged the Fifth Circuit, to invalidate the statute *in toto*. Brief for Petitioner 48 (Section 1346 "is intolerably and unconstitutionally vague."); Brief of Defendant-Appellant Jeffrey K. Skilling in No. 06–20885 (CA5), p. 65, n. 21 ("[S]ection 1346 should be invalidated as unlawfully vague on its face.").

It has long been our practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction. See, *e.g.*, *Hooper* v. *California*, 155 U. S. 648, 657 (1895) ("The elementary rule is that *every reasonable construction* must be resorted to, in order to save a statute from unconstitutionality." (emphasis added)). See also *Boos* v. *Barry*, 485 U. S. 312, 330–331 (1988); *Schneider* v. *Smith*, 390 U. S. 17, 26 (1968).[41] We have accordingly

_____

[41] "This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray* v. *The Charming Betsy*, 2 Cranch 64, 118 (1804), and has for so long been applied by this Court that it is beyond debate." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). See, *e.g.,*

instructed "the federal courts . . . to avoid constitutional difficulties by [adopting a limiting interpretation] if such a construction is fairly possible." *Boos*, 485 U. S., at 331; see *United States* v. *Harriss*, 347 U. S. 612, 618 (1954) ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague . . . . And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction.").

Arguing against any limiting construction, Skilling contends that it is impossible to identify a salvageable honest-services core; "the pre-*McNally* caselaw," he asserts, "is a hodgepodge of oft-conflicting holdings" that are "hopelessly unclear." Brief for Petitioner 39 (some capitalization and italics omitted). We have rejected an argument of the same tenor before. In *Civil Service Comm'n* v. *Letter Carriers*, federal employees challenged a provision of the Hatch Act that incorporated earlier decisions of the United States Civil Service Commission enforcing a similar law. "[T]he several thousand adjudications of the Civil

---

*New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500–501 (1979); *United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 368–370 (1971); *Machinists* v. *Street*, 367 U. S. 740, 749–750 (1961); *United States* v. *Rumely*, 345 U. S. 41, 45 (1953); *Winters* v. *New York*, 333 U. S. 507, 517 (1948); *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); *Lucas* v. *Alexander*, 279 U. S. 573, 577 (1929); *Richmond Screw Anchor Co.* v. *United States*, 275 U. S. 331, 346 (1928); *Panama R. Co.* v. *Johnson*, 264 U. S. 375, 390 (1924); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407–408 (1909); *United States* v. *Coombs*, 12 Pet. 72, 76 (1838) (Story, J.); *Parsons* v. *Bedford*, 3 Pet. 433, 448–449 (1830) (Story, J.). Cf. *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 573 (1942) (statute made it criminal to address "any offensive, derisive, or annoying word" to any person in a public place; vagueness obviated by state-court construction of the statute to cover only words having "a direct tendency to cause acts of violence" by the addressee (internal quotation marks omitted)).

Service Commission," the employees maintained, were "an impenetrable jungle"—"undiscoverable, inconsistent, [and] incapable of yielding any meaningful rules to govern present or future conduct." 413 U. S., at 571. Mindful that "our task [wa]s not to destroy the Act if we c[ould], but to construe it," we held that "the rules that had evolved over the years from repeated adjudications were subject to sufficiently clear and summary statement." *Id.,* at 571–572.

A similar observation may be made here. Although some applications of the pre-*McNally* honest-services doctrine occasioned disagreement among the Courts of Appeals, these cases do not cloud the doctrine's solid core: The "vast majority" of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes. *United States* v. *Runnels*, 833 F. 2d 1183, 1187 (CA6 1987); see Brief for United States 42, and n. 4 (citing dozens of examples).[42] Indeed, the *McNally* case itself, which spurred Congress to enact §1346, presented a paradigmatic kickback fact pattern. 483 U. S., at 352–353, 360. Congress' reversal of *McNally* and reinstatement of the honest-services doctrine, we conclude, can and should be salvaged by confining its scope to the core pre-*McNally* applications.

As already noted, *supra,* at 35–36, the honest-services doctrine had its genesis in prosecutions involving bribery

------

[42] JUSTICE SCALIA emphasizes divisions in the Courts of Appeals regarding the source and scope of fiduciary duties. *Post*, at 3–5. But these debates were rare in bribe and kickback cases. The existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute; examples include public official-public, see, *e.g., United States* v. *Mandel*, 591 F. 2d 1347 (CA4 1979); employee-employer, see, *e.g., United States* v. *Bohonus*, 628 F. 2d 1167 (CA9 1980); and union official-union members, see, *e.g., United States* v. *Price*, 788 F. 2d 234 (CA4 1986). See generally *Chiarella* v. *United States*, 445 U. S. 222, 233 (1980) (noting the "established doctrine that [a fiduciary] duty arises from a specific relationship between two parties").

allegations. See *Shushan*, 117 F. 2d, at 115 (public sec-
tor); *Procter & Gamble Co.*, 47 F. Supp., at 678 (private
sector). See also *United States* v. *Orsburn*, 525 F. 3d 543,
546 (CA7 2008). Both before *McNally* and after §1346's
enactment, Courts of Appeals described schemes involving
bribes or kickbacks as "core . . . honest services fraud
precedents," *United States* v. *Czubinski*, 106 F. 3d 1069,
1077 (CA1 1997); "paradigm case[s]," *United States* v.
*deVegter*, 198 F. 3d 1324, 1327–1328 (CA11 1999); "[t]he
most obvious form of honest services fraud," *United States*
v. *Carbo*, 572 F. 3d 112, 115 (CA3 2009); "core misconduct
covered by the statute," *United States* v. *Urciuoli*, 513
F. 3d 290, 294 (CA1 2008); "most [of the] honest services
cases," *United States* v. *Sorich*, 523 F. 3d 702, 707 (CA7
2008); "typical," *United States* v. *Brown*, 540 F. 2d 364,
374 (CA8 1976); "clear-cut," *United States* v. *Mandel*, 591
F. 2d 1347, 1363 (CA4 1979); and "uniformly . . .
cover[ed]," *United States* v. *Paradies*, 98 F. 3d 1266, 1283,
n. 30 (CA11 1996). See also Tr. of Oral Arg. 43 (counsel
for the Government) ("[T]he bulk of pre-*McNally* honest
services cases" entailed bribes or kickbacks); Brief for
Petitioner 49 ("Bribes and kickbacks were *the* paradigm
[pre-*McNally*] cases," constituting "[t]he overwhelming
majority of prosecutions for honest services fraud.").

In view of this history, there is no doubt that Congress
intended §1346 to reach *at least* bribes and kickbacks.
Reading the statute to proscribe a wider range of offensive
conduct, we acknowledge, would raise the due process
concerns underlying the vagueness doctrine.[43] To preserve

---

[43] Apprised that a broader reading of §1346 could render the statute
impermissibly vague, Congress, we believe, would have drawn the
honest-services line, as we do now, at bribery and kickback schemes.
Cf. *Levin* v. *Commerce Energy, Inc.*, 560 U. S. ___, ___ (2010) (slip op.,
at 11) ("[C]ourts may attempt . . . to implement what the legislature
would have willed had it been apprised of the constitutional infir-
mity."); *United States* v. *Booker*, 543 U. S. 220, 246 (2005) ("We seek to

Opinion of the Court

the statute without transgressing constitutional limitations, we now hold that §1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law.[44]

### 3

The Government urges us to go further by locating within §1346's compass another category of proscribed conduct: "undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.*, at 43–44. "[T]he theory of liability in *McNally* itself was nondisclosure of a conflicting financial interest," the Government observes,

———————

determine what 'Congress would have intended' in light of the Court's constitutional holding.").

[44] JUSTICE SCALIA charges that our construction of §1346 is "not interpretation but invention." *Post*, at 8. Stating that he "know[s] of no precedent for . . . 'paring down'" the pre-*McNally* case law to its core, *ibid.*, he contends that the Court today "wield[s] a power we long ago abjured: the power to define new federal crimes," *post*, at 1. See also, *e.g., post*, at 9, 10, 11. As noted *supra*, at 41–42, and n. 41, cases "paring down" federal statutes to avoid constitutional shoals are legion. These cases recognize that the Court does not *legislate*, but instead *respects the legislature*, by preserving a statute through a limiting interpretation. See *United States* v. *Lanier*, 520 U. S. 259, 267–268, n. 6 (1997) (This Court does not "create a common law crime" by adopting a "narrow[ing] constru[ction]." (internal quotation marks omitted)); *supra*, at 44–45, n. 43. Given that the Courts of Appeals uniformly recognized bribery and kickback schemes as honest-services fraud before *McNally*, 483 U. S. 350, and that these schemes composed the lion's share of honest-services cases, limiting §1346 to these heartland applications is surely "fairly possible." *Boos* v. *Barry*, 485 U. S. 312, 331 (1988); cf. *Clark* v. *Martinez*, 543 U. S. 371, 380 (2005) (opinion of the Court by SCALIA, J.) (when adopting a limiting construction, "[t]he lowest common denominator, as it were, must govern"). So construed, the statute is not unconstitutionally vague. See *infra*, at 48–49; *post*, at 8. Only by taking a wrecking ball to a statute that can be salvaged through a reasonable narrowing interpretation would we act out of step with precedent.

and "Congress clearly intended to revive th[at] nondisclosure theory." *Id.,* at 44. Moreover, "[a]lthough not as numerous as the bribery and kickback cases," the Government asserts, "the pre-*McNally* cases involving undisclosed self-dealing were abundant." *Ibid.*

Neither of these contentions withstands close inspection. *McNally*, as we have already observed, *supra*, at 37, 43, involved a classic kickback scheme: A public official, in exchange for routing Kentucky's insurance business through a middleman company, arranged for that company to share its commissions with entities in which the official held an interest. 483 U. S., at 352–353, 360. This was no mere failure to disclose a conflict of interest; rather, the official conspired with a third party so that both would profit from wealth generated by public contracts. See *id.*, at 352–353. Reading §1346 to proscribe bribes and kickbacks—and nothing more—satisfies Congress' undoubted aim to reverse *McNally* on its facts.

Nor are we persuaded that the pre-*McNally* conflict-of-interest cases constitute core applications of the honest-services doctrine. Although the Courts of Appeals upheld honest-services convictions for "some schemes of nondisclosure and concealment of material information," *Mandel*, 591 F. 2d, at 1361, they reached no consensus on which schemes qualified. In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of §1346 must exclude this amorphous category of cases.

Further dispelling doubt on this point is the familiar principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland*, 531 U. S., at 25 (quoting *Rewis* v. *United States*, 401 U. S. 808, 812 (1971)). "This interpretive guide is especially appropriate in construing [§1346] because . . . mail [and

wire] fraud [are] predicate offense[s] under [the Racketeer Influenced and Corrupt Organizations Act], 18 U. S. C. §1961(1) (1994 ed., Supp. IV), and the money laundering statute, §1956(c)(7)(A)." *Cleveland*, 531 U. S., at 25. Holding that honest-services fraud does not encompass conduct more wide-ranging than the paradigmatic cases of bribes and kickbacks, we resist the Government's less constrained construction absent Congress' clear instruction otherwise. *E.g., United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 221–222 (1952).

In sum, our construction of §1346 "establish[es] a uniform national standard, define[s] honest services with clarity, reach[es] only seriously culpable conduct, and accomplish[es] Congress's goal of 'overruling' *McNally*." Brief for Albert W. Alschuler as *Amicus Curiae* in *Weyhrauch* v. *United States*, O. T. 2009, No. 08–1196, pp. 28–29. "If Congress desires to go further," we reiterate, "it must speak more clearly than it has." *McNally*, 483 U. S., at 360.[45]

_____

[45] If Congress were to take up the enterprise of criminalizing "undisclosed self-dealing by a public official or private employee," Brief for United States 43, it would have to employ standards of sufficient definiteness and specificity to overcome due process concerns. The Government proposes a standard that prohibits the "taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty," so long as the employee acts with a specific intent to deceive and the undisclosed conduct could influence the victim to change its behavior. *Id.*, at 43–44. See also *id.*, at 40–41. That formulation, however, leaves many questions unanswered. How direct or significant does the conflicting financial interest have to be? To what extent does the official action have to further that interest in order to amount to fraud? To whom should the disclosure be made and what information should it convey? These questions and others call for particular care in attempting to formulate an adequate criminal prohibition in this context.

4

Interpreted to encompass only bribery and kickback schemes, §1346 is not unconstitutionally vague. Recall that the void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions. See *Kolender*, 461 U. S., at 357. A prohibition on fraudulently depriving another of one's honest services by accepting bribes or kickbacks does not present a problem on either score.

As to fair notice, "whatever the school of thought concerning the scope and meaning of" §1346, it has always been "as plain as a pikestaff that" bribes and kickbacks constitute honest-services fraud, *Williams* v. *United States*, 341 U. S. 97, 101 (1951), and the statute's *mens rea* requirement further blunts any notice concern, see, *e.g., Screws* v. *United States*, 325 U. S. 91, 101–104 (1945) (plurality opinion). See also *Broadrick* v. *Oklahoma*, 413 U. S. 601, 608 (1973) ("[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance . . . where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions."). Today's decision clarifies that no other misconduct falls within §1346's province. See *United States* v. *Lanier*, 520 U. S. 259, 266 (1997) ("[C]larity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute.").

As to arbitrary prosecutions, we perceive no significant risk that the honest-services statute, as we interpret it today, will be stretched out of shape. Its prohibition on bribes and kickbacks draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing—and defining—similar crimes. See, *e.g.,* 18 U. S. C. §§201(b), 666(a)(2); 41 U. S. C. §52(2) ("The term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated

persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances].").[46]  See also, *e.g., United States* v. *Ganim*, 510 F. 3d 134, 147–149 (CA2 2007) (Sotomayor, J.) (reviewing honest-services conviction involving bribery in light of elements of bribery under other federal statutes); *United States* v. *Whitfield*, 590 F. 3d 325, 352–353 (CA5 2009); *United States* v. *Kemp*, 500 F. 3d 257, 281–286 (CA3 2007).  A criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under §1346 on vagueness grounds.

C

It remains to determine whether Skilling's conduct violated §1346.  Skilling's honest-services prosecution, the Government concedes, was not "prototypical."  Brief for United States 49.  The Government charged Skilling with conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price.  It was the Government's theory at trial that Skilling "profited from the fraudulent scheme . . . through the receipt of salary and bonuses, . . . and through the sale of approximately $200 million in Enron stock, which netted him $89 million."  *Id.,* at 51.

The Government did not, at any time, allege that Skilling solicited or accepted side payments from a third party in exchange for making these misrepresentations.  See Record 41328 (May 11, 2006 Letter from the Government to the District Court) ("[T]he indictment does not allege, and the government's evidence did not show, that [Skill-

---

[46] Overlap with other federal statutes does not render §1346 superfluous.  The principal federal bribery statute, §201, for example, generally applies only to federal public officials, so §1346's application to state and local corruption and to private-sector fraud reaches misconduct that might otherwise go unpunished.

ing] engaged in bribery."). It is therefore clear that, as we read §1346, Skilling did not commit honest-services fraud.

Because the indictment alleged three objects of the conspiracy—honest-services wire fraud, money-or-property wire fraud, and securities fraud—Skilling's conviction is flawed. See *Yates* v. *United States*, 354 U. S. 298 (1957) (constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory). This determination, however, does not necessarily require reversal of the conspiracy conviction; we recently confirmed, in *Hedgpeth* v. *Pulido*, 555 U. S. ___ (2008) *(per curiam)*, that errors of the *Yates* variety are subject to harmless-error analysis. The parties vigorously dispute whether the error was harmless. Compare Brief for United States 52 ("[A]ny juror who voted for conviction based on [the honest-services theory] also would have found [Skilling] guilty of conspiring to commit securities fraud.") with Reply Brief 30 (The Government "cannot show that the conspiracy conviction rested *only* on the securities-fraud theory, rather than the distinct, legally-flawed honest-services theory."). We leave this dispute for resolution on remand.[47]

Whether potential reversal on the conspiracy count touches any of Skilling's other convictions is also an open question. All of his convictions, Skilling contends, hinged on the conspiracy count and, like dominoes, must fall if it

---

[47] The Fifth Circuit appeared to prejudge this issue, noting that, "if any of the three objects of Skilling's conspiracy offers a legally insufficient theory," it "must set aside his conviction." 554 F. 3d, at 543. That reasoning relied on the mistaken premise that *Hedgpeth* v. *Pulido*, 555 U. S. ___ (2008) *(per curiam)*, governs only cases on collateral review. See 554 F. 3d, at 543, n. 10. Harmless-error analysis, we clarify, applies equally to cases on direct appeal. Accordingly, the Fifth Circuit, on remand, should take a fresh look at the parties' harmless-error arguments.

falls. The District Court, deciding Skilling's motion for bail pending appeal, found this argument dubious, App. 1141a–1142a, but the Fifth Circuit had no occasion to rule on it. That court may do so on remand.

*    *    *

For the foregoing reasons, we affirm the Fifth Circuit's ruling on Skilling's fair-trial argument, vacate its ruling on his conspiracy conviction, and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–1394

JEFFREY K. SKILLING, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2010]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, and with whom JUSTICE KENNEDY joins except as to Part III, concurring in part and concurring in the judgment.

I agree with the Court that petitioner Jeffrey Skilling's challenge to the impartiality of his jury and to the District Court's conduct of the *voir dire* fails. I therefore join Parts I and II of the Court's opinion. I also agree that the decision upholding Skilling's conviction for so-called "honest-services fraud" must be reversed, but for a different reason. In my view, the specification in 18 U. S. C. §1346 (2006 ed., Supp. II) that "scheme or artifice to defraud" in the mail-fraud and wire-fraud statutes, §§1341 and 1343 (2006 ed.), includes "a scheme or artifice to deprive another of the intangible right of honest services," is vague, and therefore violates the Due Process Clause of the Fifth Amendment. The Court strikes a pose of judicial humility in proclaiming that our task is "not to destroy the Act . . . but to construe it," *ante*, at 43 (internal quotation marks omitted). But in transforming the prohibition of "honest-services fraud" into a prohibition of "bribery and kick-backs" it is wielding a power we long ago abjured: the power to define new federal crimes. See *United States* v. *Hudson,* 7 Cranch 32, 34 (1812).

## I

A criminal statute must clearly define the conduct it proscribes, see *Grayned* v. *City of Rockford*, 408 U. S. 104, 108 (1972). A statute that is unconstitutionally vague cannot be saved by a more precise indictment, see *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939), nor by judicial construction that writes in specific criteria that its text does not contain, see *United States* v. *Reese*, 92 U. S. 214, 219–221 (1876). Our cases have described vague statutes as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that [they] authoriz[e] or encourag[e] seriously discriminatory enforcement." *United States* v. *Williams*, 553 U. S. 285, 304 (2008). Here, Skilling argues that §1346 fails to provide fair notice and encourages arbitrary enforcement because it provides no definition of the right of honest services whose deprivation it prohibits. Brief for Petitioner 38–39, 42–44. In my view Skilling is correct.

The Court maintains that "the intangible right of honest services" means the right not to have one's fiduciaries accept "bribes or kickbacks." Its first step in reaching that conclusion is the assertion that the phrase refers to "the doctrine developed" in cases decided by lower federal courts prior to our decision in *McNally* v. *United States*, 483 U. S. 350 (1987). *Ante*, at 39. I do not contest that. I agree that Congress used the novel phrase to adopt the lower-court case law that had been disapproved by *McNally*—what the Court calls "the pre-*McNally* honest-services doctrine," *ante,* at 43. The problem is that that doctrine provides no "ascertainable standard of guilt," *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89 (1921), and certainly is not limited to "bribes or kickbacks."

Investigation into the meaning of "the pre-*McNally* honest-services doctrine" might logically begin with

*McNally* itself, which rejected it. That case repudiated the many Court of Appeals holdings that had expanded the meaning of "fraud" in the mail-fraud and wire-fraud statutes beyond deceptive schemes to obtain property. 483 U. S., at 360. If the repudiated cases stood for a prohibition of "bribery and kickbacks," one would have expected those words to appear in the opinion's description of the cases. In fact, they do not. *Not at all.* Nor did *McNally* even provide a consistent definition of the pre-existing theory of fraud it rejected. It referred variously to a right of citizens "to have the [State]'s affairs conducted honestly," *id.,* at 353, to "honest and impartial government," *id.,* at 355, to "good government," *id.,* at 356, and "to have public officials perform their duties honestly," *id.,* at 358. It described prior case law as holding that "a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud," *id.,* at 355.

But the pre-*McNally* Court of Appeals opinions were not limited to fraud by public officials. Some courts had held that those fiduciaries subject to the "honest services" obligation included private individuals who merely participated in public decisions, see, *e.g.*, *United States* v. *Gray*, 790 F. 2d 1290, 1295–1296 (CA6 1986) (citing *United States* v. *Margiotta*, 688 F. 2d 108, 122 (CA2 1982)), and even private employees who had no role in public decisions, see, *e.g.*, *United States* v. *Lemire*, 720 F. 2d 1327, 1335–1336 (CADC 1983); *United States* v. *Von Barta*, 635 F. 2d 999, 1007 (CA2 1980). Moreover, "to say that a man is a fiduciary only begins [the] analysis; it gives direction to further inquiry. . . . What obligations does he owe as a fiduciary?" *SEC* v. *Chenery Corp.*, 318 U. S. 80, 85–86 (1943). None of the "honest services" cases, neither those pertaining to public officials nor those pertaining to private employees, defined the nature and content of the fiduciary duty central to the "fraud" offense.

There was not even universal agreement concerning the

*source* of the fiduciary obligation—whether it must be positive state or federal law, see, *e.g.*, *United States* v. *Rabbitt*, 583 F. 2d 1014, 1026 (CA8 1978), or merely general principles, such as the "obligations of loyalty and fidelity" that inhere in the "employment relationship," *Lemire*, *supra*, at 1336. The decision *McNally* reversed had grounded the duty in general (not jurisdiction-specific) trust law, see *Gray*, *supra*, at 1294, a *corpus juris* festooned with various duties. See, *e.g.,* Restatement (Second) of Trusts §§169–185 (1976). Another pre-*McNally* case referred to the general law of agency, *United States* v. *Ballard*, 663 F. 2d 534, 543, n. 22 (CA5 1981), modified on other grounds by 680 F. 2d 352 (1982), which imposes duties quite different from those of a trustee.[1] See Restatement (Second) of Agency §§377–398 (1957).

This indeterminacy does not disappear if one assumes that the pre-*McNally* cases developed a federal, common-law fiduciary duty; the duty remained hopelessly undefined. Some courts described it in astoundingly broad language. *Blachly* v. *United States,* 380 F. 2d 665 (CA5 1967), loftily declared that "[l]aw puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Id.*, at 671 (quoting *Gregory* v. *United States*, 253 F. 2d 104, 109 (CA5 1958)). Other courts unhelpfully added that any scheme "contrary to public policy" was also condemned by

_____

[1] The Court is untroubled by these divisions because "these debates were rare in bribe and kickback cases," in which "[t]he existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute," *ante*, at 43, n. 42. This misses the point. The Courts of Appeals may have consistently found unlawful the acceptance of a bribe or kickback by one or another sort of fiduciary, but they have not consistently described (as the statute does not) any test for who is a fiduciary.

the statute, *United States* v. *Bohonus*, 628 F. 2d 1167, 1171 (CA9 1980). See also *United States* v. *Mandel*, 591 F. 2d 1347, 1361 (CA4 1979) (any scheme that is "contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing"). Even opinions that did not indulge in such grandiloquence did not specify the duty at issue beyond loyalty or honesty, see, *e.g., Von Barta*, *supra*, at 1005–1006. Moreover, the demands of the duty were said to be greater for public officials than for private employees, see, *e.g., Lemire*, *supra*, at 1337, n. 13; *Ballard*, *supra*, at 541, n. 17, but in what respects (or by how much) was never made clear.

The indefiniteness of the fiduciary duty is not all. Many courts held that some *je-ne-sais-quoi* beyond a mere breach of fiduciary duty was needed to establish honest-services fraud. See, *e.g., Von Barta*, *supra*, at 1006 (collecting cases); *United States* v. *George*, 477 F. 2d 508, 512 (CA7 1973). There was, unsurprisingly, some dispute about that, at least in the context of acts by persons owing duties to the public. See *United States* v. *Price,* 788 F. 2d 234, 237 (CA4 1986). And even among those courts that did require something additional where a public official was involved, there was disagreement as to what the addition should be. For example, in *United States* v. *Bush*, 522 F. 2d 641 (1975), the Seventh Circuit held that material misrepresentations and active concealment were enough, *id.,* at 647–648. But in *Rabbitt*, 583 F. 2d 1014, the Eighth Circuit held that actual harm to the State was needed, *id.,* at 1026.

Similar disagreements occurred with respect to private employees. Courts disputed whether the defendant must use his fiduciary position for his own gain. Compare *Lemire, supra*, at 1335 (yes), with *United States* v. *Bronston*, 658 F. 2d 920, 926 (CA2 1981) (no). One opinion upheld a mail-fraud conviction on the ground that the

defendant's "failure to disclose his receipt of kickbacks and consulting fees from [his employer's] suppliers resulted in a breach of his fiduciary duties depriving his employer of his loyal and honest services." *United States* v. *Bryza*, 522 F. 2d 414, 422 (CA7 1975). Another opinion, however, demanded more than an intentional failure to disclose: "There must be a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer." *Lemire*, 720 F. 2d, at 1337. Other courts required that the victim suffer some loss, see, *e.g., Ballard*, *supra*, at 541–542—a proposition that, of course, other courts rejected, see, *e.g.*, *United States* v. *Newman*, 664 F. 2d 12, 20 (CA2 1981); *United States* v. *O'Malley*, 535 F. 2d 589, 592 (CA10 1976). The Court's statement today that there was a deprivation of honest services even if "the scheme occasioned a money or property *gain* for the betrayed party," *ante*, at 36, is therefore true, except to the extent it is not.

In short, the first step in the Court's analysis—holding that "the intangible right of honest services" refers to "the honest-services doctrine recognized in Court of Appeals' decisions before *McNally*," *ante*, at 40—is a step out of the frying pan into the fire. The pre-*McNally* cases provide no clear indication of what constitutes a denial of the right of honest services. The possibilities range from any action that is contrary to public policy or otherwise immoral, to only the disloyalty of a public official or employee to his principal, to only the secret use of a perpetrator's position of trust in order to harm whomever he is beholden to. The duty probably did not have to be rooted in state law, but maybe it did. It might have been more demanding in the case of public officials, but perhaps not. At the time §1346 was enacted there was no settled criterion for choosing among these options, for conclusively settling what was in

and what was out.[2]

## II

The Court is aware of all this. It knows that adopting by reference "the pre-*McNally* honest-services doctrine," *ante*, at 43, is adopting by reference nothing more precise than the referring term itself ("the intangible right of honest services"). Hence the *deus ex machina:* "[W]e pare that body of precedent down to its core," *ante*, at 39. Since the honest-services doctrine "had its genesis" in bribery prosecutions, and since several cases and counsel for Skilling referred to bribery and kickback schemes as "core" or "paradigm" or "typical" examples, or "[t]he most obvious form," of honest-services fraud, *ante*, at 43–44 (internal quotation marks omitted), and since two cases and counsel for the Government say that they formed the "vast majority," or "most" or at least "[t]he bulk" of honest-services cases, *ante*, at 43–44 (internal quotation marks omitted), THEREFORE it must be the case that they are *all* Congress meant by its reference to the honest-services doctrine.

Even if that conclusion followed from its premises, it would not suffice to eliminate the vagueness of the statute. It would solve (perhaps) the indeterminacy of what acts constitute a breach of the "honest services" obligation under the pre-*McNally* law. But it would not solve the most fundamental indeterminacy: the character of the "fiduciary capacity" to which the bribery and kickback

_____

[2] Courts since §1346's enactment have fared no better, reproducing some of the same disputes that predated *McNally*. See, *e.g., Sorich* v. *United States*, 555 U. S. \_\_\_, \_\_\_–\_\_\_ (2009) (SCALIA, J., dissenting from denial of certiorari) (slip op., at 3–4) (collecting cases). We have previously found important to our vagueness analysis "the conflicting results which have arisen from the painstaking attempts of enlightened judges in seeking to carry out [a] statute in cases brought before them." *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89 (1921). I am at a loss to explain why the Court barely mentions those conflicts today.

restriction applies. Does it apply only to public officials? Or in addition to private individuals who contract with the public? Or to everyone, including the corporate officer here? The pre-*McNally* case law does not provide an answer. Thus, even with the bribery and kickback limitation the statute does not answer the question "What is the criterion of guilt?"

But that is perhaps beside the point, because it is obvious that mere prohibition of bribery and kickbacks was not the intent of the statute. To say that bribery and kickbacks represented "the core" of the doctrine, or that most cases applying the doctrine involved those offenses, is not to say that they *are* the doctrine. All it proves is that the multifarious versions of the doctrine *overlap* with regard to those offenses. But the doctrine itself is much more. Among all the pre-*McNally* smörgåsbord-offerings of varieties of honest-services fraud, *not one* is limited to bribery and kickbacks. That is a dish the Court has cooked up all on its own.

Thus, the Court's claim to "respec[t] the legislature," *ante*, at 45, n. 44 (emphasis deleted), is false. It is entirely clear (as the Court and I agree) that Congress meant to reinstate the body of pre-*McNally* honest-services law; and entirely clear that that prohibited much more (though precisely what more is uncertain) than bribery and kickbacks. Perhaps it is true that "Congress intended §1346 to reach *at least* bribes and kickbacks," *ante*, at 44. That simply does not mean, as the Court now holds, that "§1346 criminalizes *only*" bribery and kickbacks, *ante*, at 45.

Arriving at that conclusion requires not interpretation but invention. The Court replaces a vague criminal standard that Congress adopted with a more narrow one (included within the vague one) that can pass constitutional muster. I know of no precedent for such "paring down,"[3]

---

[3] The only alleged precedent the Court dares to describe is *Civil Ser-*

and it seems to me clearly beyond judicial power. This is not, as the Court claims, *ante*, at 41, simply a matter of adopting a "limiting construction" in the face of potential unconstitutionality. To do that, our cases have been careful to note, the narrowing construction must be "fairly possible," *Boos* v. *Barry*, 485 U. S. 312, 331 (1988), "reasonable," *Hooper* v. *California*, 155 U. S. 648, 657 (1895), or not "plainly contrary to the intent of Congress," *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). As we have seen (and the Court does not contest), *no court* before *McNally* concluded that the "deprivation of honest services" meant *only* the acceptance of bribes or kickbacks. If it were a "fairly possible" or "reasonable" construction, not "contrary to the intent of Congress," one would think that *some* court would have adopted it. The Court does not even point to a *post-McNally* case that reads §1346 to cover only bribery and kickbacks, and I am aware of none.

The canon of constitutional avoidance, on which the Court so heavily relies, see *ante*, at 41–42, states that "when the constitutionality of a statute is assailed, if the

---

*vice Comm'n* v. *Letter Carriers*, 413 U. S. 548 (1973). That case involved a provision of the Hatch Act incorporating prior adjudications of the Civil Service Commission. We upheld the provision against a vagueness challenge—not, however, by "paring down" the adjudications to a more narrow rule that we invented, but by concluding that what they held was not vague. See *id.*, at 571–574. The string of cases the Court lists, see *ante*, at 41–42, n. 41, (almost none of which addressed claims of vagueness), have nothing to do with "paring down." The one that comes closest, *United States* v. *Thirty-seven Photographs*, 402 U. S. 363 (1971), specified a time limit within which proceedings authorized by statute for the forfeiture of obscene imported materials had to be commenced and completed. That is not much different from "reading in" a reasonable-time requirement for obligations undertaken in contracts, and can hardly be described as a rewriting or "paring down" of the statute. The Court relied on legislative history anticipating that the proceedings would be prompt, *id.*, at 370–371, and noted that (unlike here) it was not "decid[ing] issues of policy," *id.*, at 372.

statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407 (1909); see also *United States* v. *Rumely*, 345 U. S. 41, 45 (1953) (describing the canon as decisive "in the choice of fair alternatives"). Here there is no choice to be made between two "fair alternatives." Until today, no one has thought (and there is no basis for thinking) that the honest-services statute prohibited only bribery and kickbacks.

I certainly agree with the Court that we must, "if we can," uphold, rather than "condemn," Congress's enactments, *ante*, at 38. But I do not believe we have the power, in order to uphold an enactment, to rewrite it. Congress enacted the entirety of the pre-*McNally* honest-services law, the content of which is (to put it mildly) unclear. In prior vagueness cases, we have resisted the temptation to make all things right with the stroke of our pen. See, *e.g., Smith* v. *Goguen*, 415 U. S. 566, 575 (1974). I would show the same restraint today, and reverse Skilling's conviction on the basis that §1346 provides no "ascertainable standard" for the conduct it condemns, *L. Cohen*, 255 U. S., at 89. Instead, the Court today adds to our functions the prescription of criminal law.

## III

A brief word about the appropriate remedy. As I noted *supra*, at 2, Skilling has argued that §1346 cannot be constitutionally applied to him because it affords no definition of the right whose deprivation it prohibits. Though this reasoning is categorical, it does not make Skilling's challenge a "facial" one, in the sense that it seeks invalidation of the statute in all its applications, as opposed to preventing its enforcement against him. I continue to

doubt whether "striking down" a statute is ever an appropriate exercise of our Article III power. See *Chicago* v. *Morales*, 527 U. S. 41, 77 (1999) (SCALIA, J., dissenting). In the present case, the universality of the infirmity Skilling identifies in §1346 may mean that if he wins, anyone else prosecuted under the statute will win as well, see *Smith*, *supra*, at 576–578. But Skilling only asks that *his* conviction be reversed, Brief for Petitioner 57–58, so *the remedy* he seeks is not facial invalidation.

I would therefore reverse Skilling's conviction under §1346 on the ground that it fails to define the conduct it prohibits. The fate of the statute in future prosecutions— obvious from my reasoning in the case—would be a matter for *stare decisis*.

\*    \*    \*

It is hard to imagine a case that more clearly fits the description of what Chief Justice Waite said could not be done, in a colorful passage oft-cited in our vagueness opinions, *United States* v. *Reese*, 92 U. S., at 221:

"The question, then, to be determined, is, whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only.

"It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government. . . .

"To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty."

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1394

_____

## JEFFREY K. SKILLING, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2010]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I join the judgment of the Court and all but Part II of the Court's opinion. I write separately to address petitioner's jury-trial argument.

The Sixth Amendment guarantees criminal defendants a trial before "an impartial jury." In my view, this requirement is satisfied so long as no biased juror is actually seated at trial. Of course, evidence of pretrial media attention and widespread community hostility may play a role in the bias inquiry. Such evidence may be important in assessing the adequacy of *voir dire*, see, *e.g.*, *Mu'Min* v. *Virginia*, 500 U. S. 415, 428–432 (1991), or in reviewing the denial of requests to dismiss particular jurors for cause, see, *e.g.*, *Patton* v. *Yount*, 467 U. S. 1025, 1036–1040 (1984). There are occasions in which such evidence weighs heavily in favor of a change of venue. In the end, however, if no biased jury is actually seated, there is no violation of the defendant's right to an impartial jury. See *id.*, at 1031–1035, 1041; *Murphy* v. *Florida*, 421 U. S. 794, 800–801, 803 (1975); see also *Rivera* v. *Illinois*, 556 U. S. ___, ___–___ (2009) (slip op., at 7–8); *United States* v. *Martinez-Salazar*, 528 U. S. 304, 311, 316–317 (2000); *Smith* v. *Phillips*, 455 U. S. 209, 215–218 (1982).

Petitioner advances a very different understanding of

the jury-trial right. Where there is extraordinary pretrial publicity and community hostility, he contends, a court must presume juror prejudice and thus grant a change of venue. Brief for Petitioner 25–34. I disagree. Careful *voir dire* can often ensure the selection of impartial jurors even where pretrial media coverage has generated much hostile community sentiment. Moreover, once a jury has been selected, there are measures that a trial judge may take to insulate jurors from media coverage during the course of the trial. What the Sixth Amendment requires is "an impartial jury." If the jury that sits and returns a verdict is impartial, a defendant has received what the Sixth Amendment requires.

The rule that petitioner advances departs from the text of the Sixth Amendment and is difficult to apply. It requires a trial judge to determine whether the adverse pretrial media coverage and community hostility in a particular case has reached a certain level of severity, but there is no clear way of demarcating that level or of determining whether it has been met.

Petitioner relies chiefly on three cases from the 1960's— *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), *Estes* v. *Texas*, 381 U. S. 532 (1965), and *Rideau* v. *Louisiana*, 373 U. S. 723 (1963). I do not read those cases as demanding petitioner's suggested approach. As the Court notes, *Sheppard* and *Estes* primarily "involved media interference with courtroom proceedings *during* trial." *Ante*, at 16, n. 14; see also *post*, at 20 (SOTOMAYOR, J., concurring in part and dissenting in part). *Rideau* involved unique events in a small community.

I share some of JUSTICE SOTOMAYOR's concerns about the adequacy of the *voir dire* in this case and the trial judge's findings that certain jurors could be impartial. See *post*, at 34–37. But those highly fact-specific issues are not within the question presented. Pet. for Cert. i. I also do not understand the opinion of the Court as reaching

any question regarding a change of venue under Federal Rule of Criminal Procedure 21.

Because petitioner, in my view, is not entitled to a reversal of the decision below on the jury-trial question that is before us, I join the judgment of the Court in full.

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1394

———————

## JEFFREY K. SKILLING, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2010]

JUSTICE SOTOMAYOR, with whom JUSTICE STEVENS and JUSTICE BREYER join, concurring in part and dissenting in part.

I concur in the Court's resolution of the honest-services fraud question and join Part III of its opinion. I respectfully dissent, however, from the Court's conclusion that Jeffrey Skilling received a fair trial before an impartial jury. Under our relevant precedents, the more intense the public's antipathy toward a defendant, the more careful a court must be to prevent that sentiment from tainting the jury. In this case, passions ran extremely high. The sudden collapse of Enron directly affected thousands of people in the Houston area and shocked the entire community. The accompanying barrage of local media coverage was massive in volume and often caustic in tone. As Enron's one-time CEO, Skilling was at the center of the storm. Even if these extraordinary circumstances did not constitutionally compel a change of venue, they required the District Court to conduct a thorough *voir dire* in which prospective jurors' attitudes about the case were closely scrutinized. The District Court's inquiry lacked the necessary thoroughness and left serious doubts about whether the jury empaneled to decide Skilling's case was capable of rendering an impartial decision based solely on the evidence presented in the courtroom. Accordingly, I would

grant Skilling relief on his fair-trial claim.

I

The majority understates the breadth and depth of community hostility toward Skilling and overlooks significant deficiencies in the District Court's jury selection process. The failure of Enron wounded Houston deeply. Virtually overnight, what had been the city's "largest, most visible, and most prosperous company," its "foremost social and charitable force," and "a source of civic pride" was reduced to a "shattered shell." App. ¶¶11, 13, pp. 649a–650a, 1152a. Thousands of the company's employees lost their jobs and saw their retirement savings vanish. As the effects rippled through the local economy, thousands of additional jobs disappeared, businesses shuttered, and community groups that once benefited from Enron's largesse felt the loss of millions of dollars in contributions. See, *e.g.*, 3 Supp. Record 1229, 1267; see also 554 F. 3d 529, 560 (CA5 2009) ("Accounting firms that serviced Enron's books had less work, hotels had more open rooms, restaurants sold fewer meals, and so on"). Enron's community ties were so extensive that the entire local U. S. Attorney's Office was forced to recuse itself from the Government's investigation into the company's fall. See 3 Supp. Record 608 (official press release).

With Enron's demise affecting the lives of so many Houstonians, local media coverage of the story saturated the community. According to a defense media expert, the Houston Chronicle—the area's leading newspaper—assigned as many as 12 reporters to work on the Enron story full time. App. 568a–569a. The paper mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy filing. Hundreds of these articles discussed Skilling by name. See 3 Supp. Record 2114. Skilling's expert, a professional journalist and academic with 30 years' experience, could

not "recall another instance where a local paper dedicated as many resources to a single topic over such an extended period of time as the Houston Chronicle . . . dedicated to Enron." App. ¶32, p. 570a. Local television news coverage was similarly pervasive and, in terms of "editorial theme," "largely followed the Chronicle's lead." *Id.*, ¶11, at 559a; see also *id.*, at 717a. Between May 2002 and October 2004, local stations aired an estimated 19,000 news segments involving Enron, more than 1600 of which mentioned Skilling. 3 Supp. Record 2116.

While many of the stories were straightforward news items, many others conveyed and amplified the community's outrage at the top executives perceived to be responsible for the company's bankruptcy. A Chronicle report on Skilling's 2002 testimony before Congress is typical of the coverage. It began, "Across Houston, Enron employees watched former chief executive Jeffrey Skilling's congressional testimony on television, turning incredulous, angry and then sarcastic by turns, as a man they knew as savvy and detail-oriented pleaded memory failure and ignorance about critical financial transactions at the now-collapsed energy giant." App. 1218a. "'He is lying; he knew everything,' said [an employee], who said she had seen Skilling frequently over her 18 years with the firm, where Skilling was known for his intimate grasp of the inner doings at the company. 'I am getting sicker by the minute.'" *Id.*, at 1219a. A companion piece quoted a local attorney who called Skilling an "idiot" who was "in denial"; he added, "I'm glad [Skilling's] not my client." *Id.*, at 592a–593a.

Articles deriding Enron's senior executives were juxtaposed with pieces expressing sympathy toward and solidarity with the company's many victims. Skilling's media expert counted nearly a hundred victim-related stories in the Chronicle, including a "multi-page layout entitled 'The Faces of Enron,'" which poignantly described the gut-wrenching experiences of former employees who lost vast

sums of money, faced eviction from their homes, could not afford Christmas gifts for their children, and felt "scared," "hurt," "humiliat[ed]," "helpless," and "betrayed." *Id*., ¶71, at 585a–586a. The conventional wisdom that blame for Enron's devastating implosion and the ensuing human tragedy ultimately rested with Skilling and former Enron Chairman Kenneth Lay became so deeply ingrained in the popular imagination that references to their involvement even turned up on the sports pages: "If you believe the story about [Coach Bill Parcells] not having anything to do with the end of Emmitt Smith's Cowboys career, then you probably believe in other far-fetched concepts. Like Jeff Skilling having nothing to do with Enron's collapse." 3 Supp. Record 811.

When a federal grand jury indicted Skilling, Lay, and Richard Causey—Enron's former chief accounting officer— in 2004 on charges of conspiracy to defraud, securities fraud, and other crimes, the media placed them directly in its crosshairs. In the words of one article, "there was one thing those whose lives were touched by the once-exalted company all seemed to agree upon: The indictment of former Enron CEO Jeff Skilling was overdue." App. 1393a. Scoffing at Skilling's attempts to paint himself as "a 'victim' of his subordinates," *id*., at 1394a, the Chronicle derided "the doofus defense" that Lay and Skilling were expected to offer, *id*., at 1401a.[1] The Chronicle referred to

––––––––––

[1] See also App. 735a (describing Enron as "hardball fraud" and noting that "Enron prosecutors have approached the case more like an organized crime investigation than a corporate fraud prosecution," a "tactic [that] makes sense" given "the sheer pervasiveness of fraud, corruption, and self-dealing"); *id*., at 1403a ("Lay stood proudly in front of Enron's facade of success, while Skilling and his own prot[égé], [Andrew] Fastow, ginned up increasingly convoluted mechanisms for concealing the financial reality. . . . A court will decide the particulars, but yes, Ken Lay knew"); *id*., 1406a, 1409a (describing Enron's collapse as "failure as a result of fraud" and criticizing Skilling for using "vitriol [as] a smokescreen" and "bolting for the door" just before Enron's stock

the coming Skilling/Lay trial as "the main event" and "The Big One," which would finally bring "the true measure of justice in the Enron saga." Record 40002; App. 1457a, 1460a.[2] On the day the superseding indictment charging Lay was issued, "the Chronicle dedicated three-quarters of its front page, 2 other full pages, and substantial portions of 4 other pages, all in the front or business sections, to th[e] story." *Id.*, ¶57, at 580a–581a.

Citing the widely felt sense of victimhood among Houstonians and the voluminous adverse publicity, Skilling moved in November 2004 for a change of venue.[3] The District Court denied the motion, characterizing the media coverage as largely "objective and unemotional." App. to Brief for United States 11a. *Voir dire*, it concluded, would provide an effective means to "ferret out any bias" in the jury pool. *Id.*, at 18a; see *ante*, at 4.

To that end, the District Court began the jury selection process by mailing screening questionnaires to 400 prospective jurors in November 2005. The completed questionnaires of the 283 respondents not excused for hardship dramatically illustrated the widespread impact of Enron's

———————

price plummeted); 3 Supp. Record 1711 (discussing the role of Skilling and Lay in "the granddaddy of all corporate frauds").

[2] According to Skilling's media expert, local television stations "adopted these same themes" and "dr[o]ve them home through such vivid and repeated visual imagery as replaying footage of Skilling's . . . 'perp walk' when details about Skilling's upcoming trial [we]re discussed." App. ¶65, p. 584a. During arraignment, news outlets "followed each man as he drove from his home to FBI headquarters, to the court, and back home, often providing 'color' commentary—such as interviewing former Enron employees for comment on the day's events." *Id.*, ¶60, at 581a.

[3] Reporting on the change-of-venue motion, the Chronicle described Skilling as a "desperate defendant," and the Austin American-Statesman opined that while a change of venue may make sense "[f]rom a legal perspective," "from the standpoint of pure justice, the wealthy executives really should be judged right where their economic hurricane struck with the most force." *Id.*, at 748a, 747a.

collapse on the Houston community and confirmed the intense animosity of Houstonians toward Skilling and his codefendants. More than one-third of the prospective jurors (approximately 99 of 283, by my count) indicated that they or persons they knew had lost money or jobs as a result of the Enron bankruptcy. Two-thirds of the jurors (about 188 of 283) expressed views about Enron or the defendants that suggested a potential predisposition to convict. In many instances, they did not mince words, describing Skilling as "smug," "arrogant," "brash," "conceited," "greedy," "deceitful," "totally unethical and criminal," "a crook," "the biggest liar on the face of the earth," and "guilty as sin" (capitalization omitted).[4] Only about 5 percent of the prospective jurors (15 of 283) did not read the Houston Chronicle, had not otherwise "heard or read about any of the Enron cases," Record 13019, were not connected to Enron victims, and gave no answers suggest-

_____

[4] See, *e.g.*, Juror 1 ("Ken Lay and the others are guilty as all get out and ought to go to jail"; Skilling is "[b]rash, [a]rrogant [and] [c]onceited"; "I find it morally awful that these people are still running loose"); Juror 70 ("Mr. Skilling is the biggest liar on the face of the earth"); Juror 163 (Skilling "would lie to his mother if it would further his cause"); Juror 185 ("I think [Skilling] was arrogant and a crook"); Juror 200 (Skilling is a "[s]killful [l]iar [and] crook" who did "a lot of the dirty work"; the defendants would "have to be blind, deaf, [and] stupid to be unaware of what was happening!" (emphasis deleted)); Juror 206 (Skilling is "[t]otally unethical and criminal"; the defendants "are all guilty and should be reduced to having to beg on the corner [and] live under a bridge"); Juror 238 ("They are all guilty as sin—come on now"); Juror 299 (Skilling "initiated, designed, [and] authorized certain illegal actions"); Juror 314 (Lay "should 'fess up' and take his punishment like a man"; "[t]he same goes for Jeffrey Skilling. . . . He and his family . . . should be stripped of *all* of their assets [and] made to start over just like the thousands he made start all over"); Juror 377 (Skilling is "[s]mug," "[g]reedy," and "[d]isingenu[ous]"; he "had an active hand in creating and sustaining a fraud"). Defendants' Renewed Motion for Change of Venue, Record, Doc. 618 (Sealed Exhs.) (hereinafter Skilling's Renewed Venue Motion); see also App. 794a–797a (summarizing additional responses).

ing possible antipathy toward the defendants.[5] The parties jointly stipulated to the dismissal of 119 members of the jury pool for cause, hardship, or disability, but numerous individuals who had made harsh comments about Skilling remained.[6]

On December 28, 2005, shortly after the questionnaires had been returned, Causey pleaded guilty. The plea was covered in lead newspaper and television stories. A front-page headline in the Chronicle proclaimed that "Causey's

—————

[5] Another 20 percent (about 59 of 283) indicated that they read the Chronicle or had otherwise heard about the Enron cases but did not report that they were victims or make comments suggesting possible bias against the defendants.

[6] See, *e.g.*, Juror 29 (Skilling is "[n]ot an honest man"); Juror 104 (Skilling "knows more than he's admitting"); Juror 211 ("I believe he was involved in wrong doings"); Juror 219 ("So many people lost their life savings because of the dishonesty of some members of the executive team"; Skilling was "[t]oo aggressive w[ith] accounting"); Juror 234 ("With his level of control and power, hard to believe that he was unaware and not responsible in some way"); Juror 240 (Skilling "[s]eems to be very much involved in criminal goings on"); Juror 255 ("[T]housands of people were taken advantage of by executives at Enron"; Skilling is "arrogant"; "Skilling was Andrew Fastow's immediate superior. Fastow has plead[ed] guilty to felony charges. I believe Skilling was aware of Fastow's illegal behavior"); Juror 263 ("Nice try resigning 6 months before the collaps[e], but again, he had to know what was going on"); Juror 272 (Skilling "[k]new he was getting out before the [d]am [b]roke"); Juror 292 (Skilling "[b]ailed out when he knew Enron was going down"); Juror 315 ("[H]ow could they not know and they seem to be lying about some things"); Juror 328 ("They should be held responsible as officers of this company for what happened"); Juror 350 ("I believe he greatly misused his power and affected hundreds of lives as a result"; "I believe they are all guilty. Their 'doings' affected not only those employed by Enron but many others as well"); Juror 360 ("I seem to remember him trying to claim to have mental or emotional issues that would remove him from any guilt. I think that is deceitful. It seems as though he is a big player in the downfall"); Juror 378 ("I believe he knew, and certainly should have known as the CEO, that illegal and improper [activities] were rampant in Enron"; "I believe all of them were instrumental, and were co-conspirators, in the massive fraud perpetrated at Enron"). Skilling's Renewed Venue Motion.

plea wreaks havoc for Lay, Skilling." Record 12049, n. 13; see also *ibid.* (quoting a former U. S. attorney who described the plea as "a serious blow to the defense"). A Chronicle editorial opined that "Causey's admission of securities fraud . . . . makes less plausible Lay's claim that most of the guilty pleas were the result of prosecutorial pressure rather than actual wrongdoing." *Id.*, at 12391.

With the trial date quickly approaching, Skilling renewed his change-of-venue motion, arguing that both the questionnaire responses and the Causey guilty plea confirmed that he could not receive a fair trial in Houston. In the alternative, Skilling asserted that "defendants are entitled to a more thorough jury selection process than currently envisioned by the [c]ourt." *Id.*, at 12067. The court had announced its intention to question individual jurors at the bench with one attorney for each side present, and to complete the *voir dire* in a single day. See, *e.g.*, *id.*, at 11804–11805, 11808. Skilling proposed, *inter alia*, that defense counsel be afforded a greater role in questioning, *id.*, at 12074; that jurors be questioned privately *in camera* or in a closed courtroom where it would be easier for counsel to consult with their colleagues, clients, and jury consultants, *id.*, at 12070–12072; and that the court "avoid leading questions," which "tend to [e]licit affirmative responses from prospective jurors that may not reflect their actual views," *id.*, at 12072. At a minimum, Skilling asserted, the court should grant a continuance of at least 30 days and send a revised questionnaire to a new group of prospective jurors. *Id.*, at 12074–12075.

The District Court denied Skilling's motion without a hearing, stating in a brief order that it was "not persuaded that the evidence or arguments urged by defendants . . . establish that pretrial publicity and/or community prejudice raise a presumption of inherent jury prejudice." *Id.*, at 14115. According to the court, the "jury questionnaires

sent to the remaining members of the jury panel and the court's voir dire examination of the jury panel provide adequate safeguards to defendants and will result in the selection of a fair and impartial jury in this case." *Id.*, at 14115–14116. The court did agree to delay the trial by two weeks, until January 30, 2006.

The coming trial featured prominently in local news outlets. A front-page, eve-of-trial story in the Chronicle described "the hurt and anger and resentment" that had been "churn[ing] inside" Houstonians since Enron's collapse. *Id.*, at 39946. Again criticizing Lay and Skilling for offering a "doofus defense" ("a plea of not guilty by reason of empty-headedness"), the paper stated that "Lay and Skilling took hundreds of millions in compensation yet now fail to accept the responsibility that went with it." *Ibid.* The article allowed that the defendants' guilt, "though perhaps widely assumed, remains even now an assertion. A jury now takes up the task of deciding whether that assertion is valid." *Id.*, at 39947. The next paragraph, however, assured readers that "it's normal for your skin to crawl when Lay or Skilling claim with doe-eyed innocence that they were unaware that something was amiss at Enron. The company's utter failure belies the claim." *Ibid.* (one paragraph break omitted); see also *id.*, at 39904 (declaring that Lay and Skilling would "have to offer a convincing explanation for how executives once touted as corporate geniuses could be so much in the dark about the illegal activities and deceptive finances of their own company").

It is against this backdrop of widespread community impact and pervasive pretrial publicity that jury selection in Skilling's case unfolded. Approximately 160 prospective jurors appeared for *voir dire* at a federal courthouse located "about six blocks from Enron's former headquarters." 554 F. 3d, at 561. Addressing them as a group, the District Court began by briefly describing the case and

providing a standard admonition about the need to be fair and impartial and to decide the case based solely on the trial evidence and jury instructions. The court then asked whether anyone had "any reservations about your ability to conscientiously and fairly follow these very important rules." App. 815a. Two individuals raised their hands and were called forward to the bench. One told the court that he thought Lay and Skilling "knew exactly what they were doing" and would have to prove their innocence. *Id.*, at 818a–819a. The second juror, who had stated on his written questionnaire that he held no opinion that would preclude him from being impartial, declared that he "would dearly love to sit on this jury. I would love to claim responsibility, at least $\frac{1}{12}$ of the responsibility, for putting these sons of bitches away for the rest of their lives." *Id.*, at 819a–820a. The court excused both jurors for cause.

The court proceeded to question individual jurors from the bench. As the majority recounts, *ante*, at 7–8, the court asked them a few general yes/no questions about their exposure to Enron-related news, often variations of, "Do you recall any particular articles that stand out that you've read about the case?" App. 850a. The court also asked about questionnaire answers that suggested bias, focusing mainly on whether, notwithstanding seemingly partial comments, the prospective jurors believed they "could be fair" and "put the government to its proof." *Id.*, at 852a. Counsel were permitted to follow up on issues raised by the court. The court made clear, however, that its patience would be limited, see, *e.g.*, *id.*, at 879a, and questioning tended to be brief—generally less than five minutes per person. Even so, it exposed disqualifying biases among several prospective jurors who had earlier expressed no concerns about their ability to be fair.[7]

―――――――――

[7] See App. 894a (Juror 43) (expressed the view that the defendants

Once it identified 38 qualified prospective jurors, the court allowed the defense and Government to exercise their allotted peremptory challenges. This left 12 jurors and 4 alternates, who were sworn in and instructed, for the first time, "not [to] read anything dealing with the case or listen to any discussion of the case on radio or television or access any Internet sites that may deal with the case" and to "inform your friends and family members that they should not discuss with you anything they may have read or heard about this case." *Id.*, at 1026a. Start to finish, the selection process took about five hours.

Skilling's trial commenced the next day and lasted four months. After several days of deliberations, the jury found Skilling guilty of conspiracy, 12 counts of securities fraud, 5 counts of making false representations to auditors, and 1 count of insider trading; it acquitted on 9 insider trading counts. The jury found Lay guilty on all counts.

On appeal, Skilling asserted that he had been denied his constitutional right to a fair trial before an impartial jury. Addressing this claim, the Court of Appeals began by disavowing the District Court's findings concerning "community hostility." There was, the court concluded, "sufficient inflammatory pretrial material to require a finding of presumed prejudice, especially in light of the immense volume of coverage." 554 F. 3d, at 559. "[P]rejudice was [also] inherent in an alleged co-conspirator's well-

_____

"stole money" from their employees); *id.*, at 922a (Juror 55) (admitted that she "lean[ed] towards prejudging" the defendants); *id.*, at 946a (Juror 71) (stated that she would place the burden of proof on the defendants); *id.*, at 954a–960a (Juror 75) (indicated that she could not set aside her view that there was fraud at Enron); *id.*, at 1003a–1006a (Juror 104) (stated that she questioned the defendants' innocence and that she "would be very upset with the government if they could not prove their case"); *id.*, at 1008a (Juror 112) (expressed that the view that the defendants were guilty).

publicized decision to plead guilty on the eve of trial." *Ibid.* The Court of Appeals, moreover, faulted the District Court for failing to "consider the wider context." *Id.*, at 560. "[I]t was not enough for the court merely to assess the tone of the news reporting. The evaluation of the volume and nature of reporting is merely a proxy for the real inquiry: whether there could be a fair trial by an impartial jury that was not influenced by outside, irrelevant sources." *Ibid.* (internal quotation marks omitted). According to the Court of Appeals, "[t]he district court seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims." *Ibid.*

Having determined that "Skilling was entitled to a presumption of prejudice," the Court of Appeals proceeded to explain that "the presumption is rebuttable, . . . and the government may demonstrate from the *voir dire* that an impartial jury was actually impanelled." *Id.*, at 561 (internal quotation marks omitted). Describing the *voir dire* as "exemplary," "searching," and "proper and thorough," *id.*, at 562, the court concluded that "[t]he government [had] met its burden of showing that the actual jury that convicted Skilling was impartial," *id.*, at 564–565. On this basis, the Court of Appeals rejected Skilling's claim and affirmed his convictions.

## II

The Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence "based on the evidence presented in court." *Irvin* v. *Dowd*, 366 U. S. 717, 723 (1961); see also *Sheppard* v. *Maxwell*, 384 U. S. 333, 362 (1966). Community passions, often inflamed by adverse pretrial publicity, can call the integrity of a trial into doubt. In

some instances, this Court has observed, the hostility of the community becomes so severe as to give rise to a "presumption of [juror] prejudice." *Patton* v. *Yount*, 467 U. S. 1025, 1031 (1984).

The Court of Appeals incorporated the concept of presumptive prejudice into a burden-shifting framework: Once the defendant musters sufficient evidence of community hostility, the onus shifts to the Government to prove the impartiality of the jury. The majority similarly envisions a fixed point at which public passions become so intense that prejudice to a defendant's fair-trial rights must be presumed. The majority declines, however, to decide whether the presumption is rebuttable, as the Court of Appeals held.

This Court has never treated the notion of presumptive prejudice so formalistically. Our decisions instead merely convey the commonsense understanding that as the tide of public enmity rises, so too does the danger that the prejudices of the community will infiltrate the jury. The underlying question has always been this: Do we have confidence that the jury's verdict was "induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print"? *Patterson* v. *Colorado ex rel. Attorney General of Colo.*, 205 U. S. 454, 462 (1907).

The inquiry is necessarily case specific. In selecting a jury, a trial court must take measures adapted to the intensity, pervasiveness, and character of the pretrial publicity and community animus. Reviewing courts, meanwhile, must assess whether the trial court's procedures sufficed under the circumstances to keep the jury free from disqualifying bias. Cf. *Murphy* v. *Florida*, 421 U. S. 794, 799 (1975) (scrutinizing the record for "any indications in the totality of circumstances that petitioner's trial was not fundamentally fair"). This Court's precedents illustrate the sort of steps required in different

situations to safeguard a defendant's constitutional right to a fair trial before an impartial jury.

At one end of the spectrum, this Court has, on rare occasion, confronted such inherently prejudicial circumstances that it has reversed a defendant's conviction "without pausing to examine . . . the *voir dire* examination of the members of the jury." *Rideau* v. *Louisiana*, 373 U. S. 723, 727 (1963). In *Rideau*, repeated television broadcasts of the defendant's confession to murder, robbery, and kidnaping so thoroughly poisoned local sentiment as to raise doubts that even the most careful *voir dire* could have secured an impartial jury. A change of venue, the Court determined, was thus the only way to assure a fair trial. *Ibid.;* see also 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §23.2(a), p. 264 (3d ed. 2007) (hereinafter LaFave) ("The best reading of *Rideau* is that the Court there recognized that prejudicial publicity may be so inflammatory and so pervasive that the voir dire simply cannot be trusted to fully reveal the likely prejudice among prospective jurors").

As the majority describes, *ante*, at 14, this Court reached similar conclusions in *Estes* v. *Texas*, 381 U. S. 532 (1965), and *Sheppard*, 384 U. S. 333. These cases involved not only massive pretrial publicity but also media disruption of the trial process itself. Rejecting the argument that the defendants were not entitled to relief from their convictions because they "ha[d] established no isolatable prejudice," the Court described the "untoward circumstances" as "inherently suspect." *Estes*, 381 U. S., at 542, 544. It would have been difficult for the jurors not to have been swayed, at least subconsciously, by the "bedlam" that surrounded them. *Sheppard*, 384 U. S., at 355. Criticizing the trial courts' failures "to protect the jury from outside influence," *id.*, at 358, the Court stressed that, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge

should continue the case until the threat abates, or transfer it to another [venue] not so permeated with publicity." *Id.*, at 363. *Estes* and *Sheppard* thus applied *Rideau*'s insight that in particularly extreme circumstances even the most rigorous *voir dire* cannot suffice to dispel the reasonable likelihood of jury bias.

Apart from these exceptional cases, this Court has declined to discount *voir dire* entirely and has instead examined the particulars of the jury selection process to determine whether it sufficed to produce a jury untainted by pretrial publicity and community animus. The Court has recognized that when antipathy toward a defendant pervades the community there is a high risk that biased jurors will find their way onto the panel. The danger is not merely that some prospective jurors will deliberately hide their prejudices, but also that, as "part of a community deeply hostile to the accused," "they may unwittingly [be] influenced" by the fervor that surrounds them. *Murphy*, 421 U. S., at 803. To assure an impartial jury in such adverse circumstances, a trial court must carefully consider the knowledge and attitudes of prospective jurors and then closely scrutinize the reliability of their assurances of fairness. Cf. *Morgan* v. *Illinois*, 504 U. S. 719, 729 (1992) ("[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors").

*Irvin* offers an example of a case in which the trial court's *voir dire* did not suffice to counter the "wave of public passion" that had swept the community prior to the defendant's trial. 366 U. S., at 728. The local news media had "extensively covered" the crimes (a murder spree), "arous[ing] great excitement and indignation." *Id.*, at 719 (internal quotation marks omitted). Following Irvin's arrest, the press "blanketed" the community with "a barrage of newspaper headlines, articles, cartoons and pictures" communicating numerous unfavorable details about

Irvin, including that he had purportedly confessed. *Id.*, at 725. Nearly 90 percent of the 430 prospective jurors examined during the trial court's *voir dire* "entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." *Id.*, at 727. Of the 12 jurors seated, 8 "thought petitioner was guilty," although "each indicated that notwithstanding his opinion he could render an impartial verdict." *Id.*, at 727, 724.

Despite the seated jurors' assurances of impartiality, this Court invalidated Irvin's conviction for want of due process. "It is not required," this Court declared, "that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, at 722–723. The Court emphasized, however, that a juror's word on this matter is not decisive, particularly when "the build-up of prejudice [in the community] is clear and convincing." *Id.*, at 725. Many of Irvin's jurors, the Court noted, had been influenced by "the pattern of deep and bitter prejudice shown to be present throughout the community." *Id.*, at 727 (internal quotation marks omitted). The Court did not "doubt [that] each juror was sincere when he said that he would be fair and impartial to [Irvin], but . . . [w]here so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." *Id.*, at 728.

The media coverage and community animosity in *Irvin* was particularly intense. In three subsequent cases, this Court recognized that high-profile cases may generate substantial publicity without stirring similar public passions. The jury selection process in such cases, the Court clarified, generally need not be as exhaustive as in a case such as *Irvin*. So long as the trial court conducts a reasonable inquiry into extrajudicial influences and the ability of prospective jurors to presume innocence and render

a verdict based solely on the trial evidence, we would generally have no reason to doubt the jury's impartiality.[8]

The first of these cases, *Murphy*, 421 U. S. 794, involved a well-known defendant put on trial for a widely publicized Miami Beach robbery. The state trial court denied his motion for a change of venue and during *voir dire* excused 20 of the 78 prospective jurors for cause. Distinguishing *Irvin*, this Court saw no indication in the *voir dire* of "such hostility to [Murphy] by the jurors who served in his trial as to suggest a partiality that could not be laid aside." 421 U. S., at 800. Although some jurors "had a vague recollection of the robbery with which [Murphy] was charged and each had some knowledge of [his] past crimes," "none betrayed any belief in the relevance of [Murphy's] past to the present case." *Ibid.;* see also *ibid.*, n. 4 (contrasting a juror's "mere familiarity with [a defendant] or his past" with "an actual predisposition against him"). "[T]hese indicia of impartiality," the Court suggested, "might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory, but the circumstances surrounding [Murphy's] trial [were] not at all of that variety." *Id.*, at 802.

In a second case, *Yount*, 467 U. S. 1025, the defendant was granted a new trial four years after being convicted of murder. He requested a change of venue, citing pretrial publicity and the widespread local knowledge that he had previously been convicted and had made confessions that would be inadmissible in court. The state trial court denied Yount's motion and seated a jury following a 10-day *voir dire* of 292 prospective jurors. Nearly all of the

--------

[8] Of course, even if the jury selection process is adequate, a trial court violates a defendant's right to an impartial jury if it erroneously denies a for-cause challenge to a biased venire member who ultimately sits on the jury. See, *e.g.*, *United States* v. *Martinez-Salazar*, 528 U. S. 304, 316 (2000) ("[T]he seating of any juror who should have been dismissed for cause . . . would require reversal").

prospective jurors had heard of the case, and 77 percent "admitted they would carry an opinion into the jury box." *Id.*, at 1029. Declining to grant relief on federal habeas review, this Court stressed the significant interval between Yount's first trial—when "adverse publicity and the community's sense of outrage were at their height"—and his second trial, which "did not occur until four years later, at a time when prejudicial publicity was greatly diminished and community sentiment had softened." *Id.*, at 1032. While 8 of the 14 seated jurors and alternates had "at some time . . . formed an opinion as to Yount's guilt," the "particularly extensive" *voir dire* confirmed that "time had weakened or eliminated any" bias they once may have harbored. *Id.*, at 1029–1030, 1034, n. 10, 1033. Accordingly, this Court concluded, "the trial court did not commit manifest error in finding that the jury as a whole was impartial." *Id.*, at 1032.

This Court most recently wrestled with the issue of pretrial publicity in *Mu'Min* v. *Virginia*, 500 U. S. 415 (1991). Mu'Min stood accused of murdering a woman while out of prison on a work detail. Citing 47 newspaper articles about the crime, Mu'Min moved for a change of venue. The state trial court deferred its ruling and attempted to seat a jury. During group questioning, 16 of the 26 prospective jurors indicated that they had heard about the case from media or other sources. Dividing these prospective jurors into panels of four, the court asked further general questions about their ability to be fair given what they had heard or read. One juror answered equivocally and was dismissed for cause. The court refused Mu'Min's request to ask more specific questions "relating to the content of news items that potential jurors might have read or seen." *Id.*, at 419. Of the 12 persons who served on the jury, "8 had at one time or another read or heard something about the case. None had indicated that he had formed an opinion about the

case or would be biased in any way." *Id.*, at 421.

Rejecting Mu'Min's attempt to analogize his case to *Irvin*, this Court observed that "the cases differ both in the kind of community in which the coverage took place and in extent of media coverage." 500 U. S., at 429. Mu'Min's offense occurred in the metropolitan Washington, D. C., area, "which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year." *Ibid.* While the crime garnered "substantial" pretrial publicity, the coverage was not as pervasive as in *Irvin* and "did not contain the same sort of damaging information." 500 U. S., at 429–430. Moreover, in contrast to *Irvin*, the seated jurors uniformly disclaimed having ever formed an opinion about the case. Given these circumstances, this Court rebuffed Mu'Min's assertion that the trial court committed constitutional error by declining to "make precise inquiries about the contents of any news reports that potential jurors have read." 500 U. S., at 424. The Court stressed, however, that its ruling was context-specific: "Had the trial court in this case been confronted with the 'wave of public passion' engendered by pretrial publicity that occurred in connection with Irvin's trial, the Due Process Clause of the Fourteenth Amendment might well have required more extensive examination of potential jurors than it undertook here." *Id.*, at 429.

### III

It is necessary to determine how this case compares to our existing fair-trial precedents. Were the circumstances so inherently prejudicial that, as in *Rideau*, even the most scrupulous *voir dire* would have been "but a hollow formality" incapable of reliably producing an impartial jury? 373 U. S., at 726. If the circumstances were not of this character, did the District Court conduct a jury selection process sufficiently adapted to the level of pretrial publicity and

community animus to ensure the seating of jurors capable of presuming innocence and shutting out extrajudicial influences?

## A

Though the question is close, I agree with the Court that the prospect of seating an unbiased jury in Houston was not so remote as to compel the conclusion that the District Court acted unconstitutionally in denying Skilling's motion to change venue. Three considerations lead me to this conclusion. First, as the Court observes, *ante*, at 16, the size and diversity of the Houston community make it probable that the jury pool contained a nontrivial number of persons who were unaffected by Enron's collapse, neutral in their outlook, and unlikely to be swept up in the public furor. Second, media coverage of the case, while ubiquitous and often inflammatory, did not, as the Court points out, *ante*, at 17, contain a confession by Skilling or similar "smoking-gun" evidence of specific criminal acts. For many prospective jurors, the guilty plea of codefendant and alleged co-conspirator Causey, along with the pleas and convictions of other Enron executives, no doubt suggested guilt by association. But reasonable minds exposed to such information would not necessarily have formed an indelible impression that Skilling himself was guilty as charged. Cf. *Rideau*, 373 U. S., at 726 (a majority of the county's residents were "exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged"). Third, there is no suggestion that the courtroom in this case became, as in *Estes* and *Sheppard*, a "carnival" in which the "calmness and solemnity" of the proceedings was compromised. *Sheppard*, 384 U. S., at 358, 350 (internal quotation marks omitted). It is thus appropriate to examine the *voir dire* and determine whether it instills confidence in the impartiality of the

jury actually selected.[9]

## B

In concluding that the *voir dire* "adequately detect[ed] and defuse[d] juror bias," *ante*, at 20, the Court downplays the extent of the community's antipathy toward Skilling and exaggerates the rigor of the jury selection process. The devastating impact of Enron's collapse and the relentless media coverage demanded exceptional care on the part of the District Court to ensure the seating of an impartial jury. While the procedures employed by the District Court might have been adequate in the typical high-profile case, they did not suffice in the extraordinary circumstances of this case to safeguard Skilling's constitutional right to a fair trial before an impartial jury.

––––––––––

[9] Whether the District Court abused its discretion in declining to change venue pursuant to the Federal Rules of Criminal Procedure is a different question. See Fed. Rule Crim. Proc. 21(a) ("Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there"). As this Court has indicated, its supervisory powers confer "more latitude" to set standards for the conduct of trials in federal courts than in state courts. *Mu'Min* v. *Virginia*, 500 U. S. 415, 424 (1991). While the circumstances may not constitutionally compel a change of venue "without pausing to examine . . . the *voir dire*," *Rideau* v. *Louisiana*, 373 U. S. 723, 727 (1963), the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling certainly meant that the task of reliably identifying untainted jurors posed a major challenge, with no guarantee of success. It likely would have been far easier to empanel an impartial jury in a venue where the Enron story had less salience. I thus agree with the Court of Appeals that "[i]t would not have been imprudent for the [District] [C]ourt to have granted Skilling's transfer motion." 554 F. 3d 529, 558 (CA5 2009). Skilling, however, likely forfeited any Rule 21 or supervisory powers claim by failing to present it either in his opening brief before the Fifth Circuit, see *id.*, at 559, n. 39, or in his petition for certiorari, cf. *ante*, at 12, n. 11.

In conducting this analysis, I am mindful of the "wide discretion" owed to trial courts when it comes to jury-related issues. *Mu'Min*, 500 U. S., at 427; cf. *ante*, at 20–21. Trial courts are uniquely positioned to assess public sentiment and the credibility of prospective jurors. Proximity to events, however, is not always a virtue. Persons in the midst of a tumult often lack a panoramic view. "[A]ppellate tribunals [thus] have the duty to make an independent evaluation of the circumstances." *Sheppard*, 384 U. S., at 362. In particular, reviewing courts are well qualified to inquire into whether a trial court implemented procedures adequate to keep community prejudices from infecting the jury. If the jury selection process does not befit the circumstances of the case, the trial court's rulings on impartiality are necessarily called into doubt. See *Morgan*, 504 U. S., at 729–730 ("'Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled'" (quoting *Rosales-Lopez* v. *United States*, 451 U. S. 182, 188 (1981) (plurality opinion))); see also *Mu'Min*, 500 U. S., at 451 (KENNEDY, J., dissenting) ("Our willingness to accord substantial deference to a trial court's finding of juror impartiality rests on our expectation that the trial court will conduct a sufficient *voir dire* to determine the credibility of a juror professing to be impartial").

1

As the Court of Appeals apprehended, the District Court gave short shrift to the mountainous evidence of public hostility. For Houstonians, Enron's collapse was an event of once-in-a-generation proportions. Not only was the volume of media coverage "immense" and frequently intemperate, but "the sheer number of victims" created a climate in which animosity toward Skilling ran deep and

the desire for conviction was widely shared. 554 F. 3d, at
559–560.

The level of public animus toward Skilling dwarfed that
present in cases such as *Murphy* and *Mu'Min*. The pre-
trial publicity in those cases consisted of dozens of news
reports, most of which were "largely factual in nature."
*Murphy*, 421 U. S., at 802. There was no indication that
the relevant communities had been captivated by the
cases or had adopted fixed views about the defendants. In
contrast, the number of media reports in this case reached
the tens of thousands, and full-throated denunciations of
Skilling were common. The much closer analogy is thus to
*Irvin*, which similarly featured a "barrage" of media cover-
age and a "huge . . . wave of public passion," 366 U. S., at
725, 728, although even that case did not, as here, involve
direct harm to entire segments of the community.[10]

Attempting to distinguish *Irvin*, the majority suggests
that Skilling's economic offenses were less incendiary than
Irvin's violent crime spree and that "news stories about
Enron contained nothing resembling the horrifying infor-
mation rife in reports about Irvin's rampage of robberies
and murders." *Ante*, at 28. Along similar lines, the Dis-
trict Court described "the facts of this case [as] neither
heinous nor sensational." App. to Brief for United States
10a. The majority also points to the four years that
passed between Enron's declaration of bankruptcy and the
start of Skilling's trial, asserting that "the decibel level of
media attention diminished somewhat" over this time.
*Ante*, at 17. Neither of these arguments is persuasive.

First, while violent crimes may well provoke widespread
community outrage more readily than crimes involving
monetary loss, economic crimes are certainly capable of

---

[10] One of Skilling's experts noted that, "[i]n cases involving 200 or
more articles, trial judges granted a change of venue 59% of the time."
App. ¶30, p. 611a.

rousing public passions, particularly when thousands of unsuspecting people are robbed of their livelihoods and retirement savings. Indeed, the record in this case is replete with examples of visceral outrage toward Skilling and other Enron executives. See, *e.g.*, Record 39946 (front-page, eve-of-trial story describing "the hurt and anger and resentment . . . churn[ing] inside" the people of Houston). Houstonians compared Skilling to, among other things, a rapist, an axe murderer, and an Al Qaeda terrorist.[11] As one commentator observed, "[i]t's a sign of how shocked Houstonians are about Enron's ignominious demise that Sept. 11 can be invoked—and is frequently—to explain the shock of the company's collapse." 3 Supp. Record 544. The bad blood was so strong that Skilling and other top executives hired private security to protect themselves from persons inclined to take the law into their own hands. See, *e.g.*, App. 1154a ("After taking the temperature of Enron's victims, [a local lawyer] says the Enron executives are wise to take security precautions").

Second, the passage of time did little to soften community sentiment. Contrary to the Court's suggestion, *ante*, at 17, this case in no way resembles *Yount*, where, by the time of the defendant's retrial, "prejudicial publicity [had] greatly diminished" and community animus had signifi-

––––––––––

[11] See, *e.g.*, 554 F. 3d, at 559, n. 42 ("I'm livid, absolutely livid . . . . I have lost my entire friggin' retirement to these people. They have raped all of us" (internal quotation marks omitted)); App. 382a ("Hurting that many elderly people so severely is, I feel, the equivalent of being an axe murderer. His actions were just as harmful as an axe murderer to the [community]" (alteration in original)); *id.*, at 1152a–1153a ("Not having the stuff of suicide bombers, Enron's executive pilots took full advantage of golden parachutes to bail out of their high-flying corporate jet after setting the craft on a course to financial oblivion. In a business time frame, Enron pancaked faster than the twin towers"); *id.*, at 1163a (noting that "Skilling's picture turned up alongside Osama bin Laden's on 'Wanted' posters inside the company headquarters").

cantly waned. 467 U. S., at 1032; see also *ibid.* (in the months preceding the defendant's retrial, newspaper reports about the case averaged "less than one article per month," and public interest was "minimal"). The Enron story was a continuing saga, and "publicity remained intense throughout." 554 F. 3d, at 560. Not only did Enron's downfall generate wall-to-wall news coverage, but so too did a succession of subsequent Enron-related events.[12] Of particular note is the highly publicized guilty plea of codefendant Causey just weeks before Skilling's trial. If anything, the time that elapsed between the bankruptcy and the trial made the task of seating an unbiased jury more difficult, not less. For many members of the jury pool, each highly publicized Enron-related guilty plea or conviction likely served to increase their certainty that Skilling too had engaged in—if not master-minded—criminal acts, particularly given that the media

————————

[12] Among the highlights: In 2002, Skilling testified before Congress, and other Enron executives invoked their Fifth Amendment rights; Enron auditor Arthur Andersen was indicted, tried, convicted, and sentenced on charges of obstruction of justice; the Enron Task Force charged Enron CFO and Skilling-protégé Andrew Fastow with fraud, money laundering, and other crimes; and at least two Enron employees pleaded guilty on fraud and tax charges. In 2003, the Enron Task Force indicted numerous Enron employees, including Ben Glisan, Jr. (the company's treasurer), Lea Fastow (wife of Andrew and an assistant treasurer), and more than half a dozen executives of Enron Broadband Services; several Enron employees entered guilty pleas and received prison sentences; and Enron filed its bankruptcy reorganization plan. In 2004, Andrew and Lea Fastow both pleaded guilty; Skilling and Causey were indicted in February; a superseding indictment adding Lay was filed in July; a number of additional Enron employees entered guilty pleas; and former Enron employees and Merrill Lynch bankers were defendants in a 6-week trial in Houston concerning an Enron deal involving the sale of Nigerian barges. In 2005, a 3-month trial was held in Houston for five executives of Enron Broadband Services; various pretrial proceedings occurred in the run up to the trial of Skilling, Lay, and Causey; and, three weeks before the scheduled trial date, Causey pleaded guilty to securities fraud.

coverage reinforced this view. See *supra*, at 7–8. The trial of Skilling and Lay was the culmination of all that had come before. See Record 40002 (noting that "prosecutors followed the classic pattern of working their way up through the ranks"). As the Chronicle put it in July 2005, shortly after the trial of several Enron Broadband Services executives ended without convictions, "The real trial, the true measure of justice in the Enron saga, begins in January. Let the small fry swim free if need be. We've got bigger fish in need of frying." App. 1460a (paragraph breaks omitted); see also *ibid.* ("From the beginning, the Enron prosecution has had one true measure of success: Lay and Skilling in a cold steel cage").

Any doubt that the prevailing mindset in the Houston community remained overwhelmingly negative was dispelled by prospective jurors' responses to the written questionnaires. As previously indicated, *supra*, at 5–7, more than one-third of the prospective jurors either knew victims of Enron's collapse or were victims themselves, and two-thirds gave responses suggesting an antidefendant bias. In many instances their contempt for Skilling was palpable. See nn. 4, 6, *supra.* Only a small fraction of the prospective jurors raised no red flags in their responses. And this was *before* Causey's guilty plea and the flurry of news reports that accompanied the approach of trial. One of Skilling's experts, a political scientist who had studied pretrial publicity "for over 35 years" and consulted in more than 200 high-profile cases (in which he had recommended against venue changes more often than not), "c[a]me to the conclusion that the extent and depth of bias shown in these questionnaires is the highest or at least one of the very highest I have ever encountered." App. ¶¶2, 7, pp. 783a, 785a (emphasis deleted).

### 2

Given the extent of the antipathy evident both in the

community at large and in the responses to the written questionnaire, it was critical for the District Court to take "strong measures" to ensure the selection of "an impartial jury free from outside influences." *Sheppard*, 384 U. S., at 362. As this Court has recognized, "[i]n a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question." *Murphy*, 421 U. S., at 803; see also *Groppi* v. *Wisconsin*, 400 U. S. 505, 510 (1971) ("'[A]ny judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere'" (quoting *Frank* v. *Mangum*, 237 U. S. 309, 349 (1915) (Holmes, J., dissenting))). Perhaps because it had underestimated the public's antipathy toward Skilling, the District Court's 5-hour *voir dire* was manifestly insufficient to identify and remove biased jurors.[13]

As an initial matter, important lines of inquiry were not

---

[13] The majority points out that the jury selection processes in the three previous Enron trials that had been held in Houston were similarly brief. See *ante*, at 23. The circumstances of those cases, however, were very different. In particular, the defendants had not been personally subjected to anything approaching the withering public criticism that had been directed at Skilling and Lay. As earlier noted, see, *e.g.*, *supra*, at 25–26, it was the trial of Skilling and Lay that was widely seen as the climactic event of the Enron saga. Accordingly, my conclusion that the jury selection process in this unusual case did not suffice to select an impartial jury does not cast doubt on the adequacy of the processes used in the earlier Enron prosecutions.

Moreover, in referencing the length of the *voir dire* in this case, I do not mean to suggest that length should be a principal measure of the adequacy of a jury selection process. Trial courts, including this one, should be commended for striving to be efficient, but they must always take care to ensure that their expeditiousness does not compromise a defendant's fair-trial right. I also express no view with respect to court-led versus attorney-led *voir dire*. Federal Rule of Criminal Procedure 24(a) gives district courts discretion to choose between these options, and I have no doubt that either is capable of producing an impartial jury even in high profile cases so long as the trial court assures that the scope of the *voir dire* is tailored to the circumstances.

pursued at all. The majority accepts, for instance, that "publicity about a codefendant's guilty plea calls for inquiry to guard against actual prejudice." *Ante*, at 19. Implying that the District Court undertook this inquiry, the majority states that "[o]nly two venire members recalled [Causey's] plea." *Ibid.* In fact, the court asked very few prospective jurors any questions directed to their knowledge of or feelings about that event.[14] Considering how much news the plea generated, many more than two venire members were likely aware of it. The lack of questioning, however, makes the prejudicial impact of the plea on those jurors impossible to assess.

The court also rarely asked prospective jurors to describe personal interactions they may have had about the case, or to consider whether they might have difficulty avoiding discussion of the case with family, friends, or colleagues during the course of the lengthy trial. The tidbits of information that trickled out on these subjects provided cause for concern. In response to general media-related questions, several prospective jurors volunteered that they had spoken with others about the case. Juror 74, for example, indicated that her husband was the "news person," that they had "talked about it," that she had also heard things "from work," and that what she heard was "all negative, of course." App. 948a. The court, however, did not seek elaboration about the substance of these interactions. Surely many prospective jurors had similar

---

[14] Juror 33 brought up the plea in response to the District Court's question about whether he "recall[ed] listening to any particular programs about the case." App. 888a. Juror 96, meanwhile, told the court that he read the "whole" Houston Chronicle every day, including "all the articles about Enron." *Id.*, at 992a. The court, however, did not ask any questions designed to elicit information about the Causey plea. Instead, Juror 96 remarked on the plea only after Skilling's counsel managed to squeeze in a follow-up as to whether he had "read about any guilty pleas in this case over the last month or two." *Id.*, at 993a.

conversations, particularly once they learned upon receiving the written questionnaire that they might end up on Skilling's jury.

Prospective jurors' personal interactions, moreover, may well have left them with the sense that the community was counting on a conviction. Yet this too was a subject the District Court did not adequately explore. On the few occasions when prospective jurors were asked whether they would feel pressure from the public to convict, they acknowledged that it might be difficult to return home after delivering a not-guilty verdict. Juror 75, for instance, told the court, "I think a lot of people feel that they're guilty. And maybe they're expecting something to come out of this trial." *Id.*, at 956a. It would be "tough," she recognized, "to vote not guilty and go back into the community." *Id.*, at 957a; see also *id.*, at 852a (Juror 10) (admitting "some hesitancy" about "telling people the government didn't prove its case").

With respect to potential nonmedia sources of bias, the District Court's exchange with Juror 101 is particularly troubling.[15] Although Juror 101 responded in the negative when asked whether she had "read anything in the newspaper that [stood] out in [her] mind," she volunteered that she "just heard that, between the two of them, [Skilling and Lay] had $43 million to contribute for their case and that there was an insurance policy that they could collect on, also." *Id.*, at 998a. This information, she explained, "was just something I overheard today—other jurors talking." *Ibid.* It seemed suspicious, she intimated, "to have an insurance policy ahead of time." *Id.*, at 999a. The court advised her that "most corporations provide insurance for their officers and directors." *Ibid.* The court, however, did not investigate the matter further, even

_____

[15] Portions of the *voir dire* transcript erroneously refer to this prospective juror as "Juror 110." See, *e.g.*, *id.*, at 996a.

though it had earlier instructed prospective jurors not to talk to each other about the case. *Id.*, at 843a. It is thus not apparent whether other prospective jurors also overheard the information and whether they too believed that it reflected unfavorably on the defendants; nor is it apparent what other outside information may have been shared among the venire members. At the very least, Juror 101's statements indicate that the court's questions were failing to bring to light the extent of jurors' exposure to potentially prejudicial facts and that some prospective jurors were having difficulty following the court's directives.

The topics that the District Court did cover were addressed in cursory fashion. Most prospective jurors were asked just a few yes/no questions about their general exposure to media coverage and a handful of additional questions concerning any responses to the written questionnaire that suggested bias. In many instances, their answers were unenlightening.[16] Yet the court rarely sought to draw them out with open-ended questions about their impressions of Enron or Skilling and showed limited patience for counsel's followup efforts. See, *e.g.*, *id.*, at

---

[16] The court's exchange with Juror 20 (who sat on the jury) is typical:

"Q. Do you remember reading any particular articles about this case or Mr. Lay or Mr. Skilling?

"A. Not until just recently this week, but nothing—

"Q. And there have been a lot of articles this week.

"A. Yeah.

"Q. Do you recall any particular articles you've read in the last week or so?

"A. Not word for word, no.

"Q. Did you read all the articles in the Sunday "Chronicle"?

"A. Some of them.

"Q. Which ones do you remember reading?

"A. The one about the trial, I think, and how the trial was going to work." *Id.*, at 873a–874a.

879a, 966a.[17]  When prospective jurors were more forth-coming, their responses tended to highlight the ubiquity and negative tone of the local news coverage, thus under-scoring the need to press the more guarded members of the venire for further information.[18]  Juror 17, for exam-ple, mentioned hearing a radio program that very morning in which a former Enron employee compared persons who did not think Skilling was guilty to Holocaust deniers.  See *id.*, at 863a ("[H]e said he thought that he would find them guilty automatically if he was on the jury because he said that it would be worse than a German trying to say that they didn't kill the Jews").[19]  Other jurors may well have encountered, and been influenced by, similarly incendiary rhetoric.

These deficiencies in the form and content of the *voir*

_____

[17] The majority's criticism of Skilling's counsel for failing to ask ques-tions of many of the prospective jurors, cf. *ante*, at 23–24, is thus misplaced.  Given the District Court's express warning early in the *voir dire* that it would not allow counsel "to ask individual questions if [they] abuse[d]" that right, App. 879a, counsel can hardly be blamed for declining to test the court's boundaries at every turn.  Moreover, the court's perfunctory exchanges with prospective jurors often gave counsel no clear avenue for further permissible inquiry.

[18] Although the District Court underestimated the extent of the com-munity hostility, it was certainly aware of the ubiquity of the pretrial publicity, acknowledging that "all of us have been exposed to substan-tial media attention about this case."  *Id.*, at 841a.  The court even made an offhand remark about one of the prior Enron prosecutions, "the Nigerian barge case," apparently expecting that the prospective jurors would understand the reference.  *Id.*, at 840a.

[19] Taking a more defendant-favorable line than most prospective ju-rors, Juror 17 stated that he "thought the guy [on the radio] was pretty narrow minded," that "everyone should be considered innocent totally until they get a chance to come [to] court," and that the Government might have been overzealous in some of its Enron-related prosecutions.  *Id.*, at 863a–864a.  He added, however, that he "believe[d] there was probably some accounting fraud [at Enron]."  *Id.*, at 864a.  The District Court denied the Government's request to remove Juror 17 for cause, but he did not ultimately sit on the jury.

*dire* questions contributed to a deeper problem: The District Court failed to make a sufficiently critical assessment of prospective jurors' assurances of impartiality. Although the Court insists otherwise, *ante*, at 26, the *voir dire* transcript indicates that the District Court essentially took jurors at their word when they promised to be fair. Indeed, the court declined to dismiss for cause any prospective juror who ultimately gave a clear assurance of impartiality, no matter how much equivocation preceded it. Juror 29, for instance, wrote on her questionnaire that Skilling was "not an honest man." App. 881a. During questioning, she acknowledged having previously thought the defendants were guilty, and she disclosed that she lost $50,000–$60,000 in her 401(k) as a result of Enron's collapse. *Id.*, at 880a, 883a. But she ultimately agreed that she would be able to presume innocence. *Id.*, at 881a, 884a. Noting that she "blame[d] Enron for the loss of her money" and appeared to have "unshakeable bias," Skilling's counsel challenged her for cause. *Id.*, at 885a. The court, however, declined to remove her, stating that "she answered candidly she's going to have an open mind now" and "agree[ing]" with the Government's assertion that "we have to take her at her word." *Id.*, at 885a–886a.[20]  As

————————

[20] The majority attempts to downplay the significance of Juror 29 by noting that she did not end up on the jury because Skilling used a peremptory challenge to remove her. See *ante*, at 30, n. 32. The majority makes a similar point with respect to other venire members who were not ultimately seated. See *ante*, at 24, n. 24. The comments of these venire members, however, are relevant in assessing the impartiality of the seated jurors, who were similarly "part of a community deeply hostile to the accused" and who may have been "unwittingly influenced by it." *Murphy* v. *Florida*, 421 U. S. 794, 803 (1975); see also *Irvin* v. *Dowd*, 366 U. S. 717, 728 (1961). Moreover, the fact that the District Court failed to remove persons as dubiously qualified as Juror 29 goes directly to the adequacy of its *voir dire*. If Juror 29 made it through to the end of the selection process, it is difficult to have confidence in the impartiality of the jurors who sat, especially given how

this Court has made plain, jurors' assurances of impartiality simply are not entitled to this sort of talismanic significance. See, *e.g.*, *Murphy*, 421 U. S., at 800 ("[T]he juror's assurances that he is equal to th[e] task cannot be dispositive of the accused's rights"); *Irvin*, 366 U. S., at 728 ("Where so many, so many times, admi[t] prejudice, . . . a statement of impartiality can be given little weight").

Worse still, the District Court on a number of occasions accepted declarations of impartiality that were equivocal on their face. Prospective jurors who "hope[d]" they could presume innocence and did "not necessarily" think Skilling was guilty were permitted to remain in the pool. App. 932a, 857a. Juror 61, for instance, wrote of Lay on her questionnaire, "Shame on him." *Id.*, at 931a. Asked by the court about this, she stated that, "innocent or guilty, he was at the helm" and "should have known what was going on at the company." *Ibid.;* see also *id.*, at 934a (Skilling is "probably" "in the same boat as" Lay). The court then asked, "can you presume, as you start this trial, that Mr. Lay is innocent?" *Id.*, at 932a. She responded, "I hope so, but you know. I don't know. I can't honestly answer that one way or the other." *Ibid.;* see also *id.*, at 933a ("I bring in my past history. I bring in my biases. I would like to think I could rise above those, but I've never been in this situation before. So I don't know how I could honestly answer that question one way or the other. . . . I do have some concerns"). Eventually, however, Juror 61 answered "Yes" when the court asked if she would be able to acquit if she had "a reasonable doubt that the defendants are guilty." *Id.*, at 933a–934a. Challenging her for cause, defense counsel insisted that they had not received "a clear and unequivocal answer" about her ability to be

————————

little is known about many of them. Cf. 6 LaFave §23.2(f), at 288 ("The responses of those not seated casts light on the credibility of the seated jurors who were familiar with the same publicity").

fair. *Ibid.* The court denied the challenge, stating, "You know, she tried." *Ibid.*

3

The majority takes solace in the fact that most of the persons actually seated as jurors and alternates "specifically stated that they had paid scant attention to Enron-related news." *Ante*, at 24–25, and n. 26.[21] In context, however, these general declarations reveal little about the seated jurors' actual knowledge or views or the possible pressure they might have felt to convict, and thus cannot instill confidence that the jurors "were not under [the] sway" of the prevailing community sentiment. Cf. *ante*, at 25. Jurors who did not "get into details" of Enron's complicated accounting schemes, App. 856a, nevertheless knew the outline of the oft-repeated story, including that Skilling and Lay had been cast as the leading villains. Juror 63, for instance, told the court that she "may have heard a little bit" about Enron-related litigation but had not "really pa[id] attention." *Id.*, at 935a. Yet she was clearly aware of some specifics. On her questionnaire, despite stating that she had not followed Enron-related news, she wrote about "whistleblowers and Arthur Andersen lying about Enron's accounting," and she expressed the view that Skilling and Lay "probably knew they were breaking the law." Supp. App. 105sa–106sa. During questioning, which lasted barely four minutes, the District Court obtained no meaningful information about the actual extent of Juror 63's familiarity with the case or the basis for her belief in Skilling's guilt. Yet it nevertheless

―――――――

[21] The majority also notes that about two-thirds of the seated jurors and alternates (11 of 16) had no personal Enron connection. *Ante*, at 24, and n. 25. This means, of course, that five of the seated jurors and alternates did have connections to friends or colleagues who had lost jobs or money as a result of Enron's collapse—a fact that does not strike me as particularly reassuring.

accepted her assurance that she could "absolutely" presume innocence. App. 937a.[22]

Indeed, the District Court's anemic questioning did little to dispel similar doubts about the impartiality of numerous other seated jurors and alternates. In my estimation, more than half of those seated made written and oral comments suggesting active antipathy toward the defendants. The majority thus misses the mark when it asserts that "Skilling's seated jurors . . . exhibited nothing like the display of bias shown in *Irvin*." *Ante*, at 29. Juror 10, for instance, reported on his written questionnaire that he knew several co-workers who owned Enron stock; that he personally may have owned Enron stock through a mutual fund; that he heard and read about the Enron cases from the "Houston Chronicle, all three Houston news channels, Fox news, talking with friends [and] co-workers, [and] Texas Lawyer Magazine"; that he believed Enron's collapse "was due to greed and mismanagement"; that "[i]f [Lay] did not know what was going on in his company, he was really a poor manager/leader"; and that the defendants were "suspect." Supp. App. 11sa–19sa. During questioning, he said he "th[ought]" he could presume innocence and "believe[d]" he could put the Government to its proof, but he also acknowledged that he might have "some hesitancy" "in telling people the government didn't prove its case." App. 851a–852a.

_____

[22] As one of Skilling's jury experts observed, there is a "tendency in voir dire of jury pool members in high-profile cases to minimize their exposure to media, their knowledge of prejudicial information, and any biases they may have." App. 763a; see also *id.*, at 637a ("Those who perceive themselves or wish to be perceived as good citizens are reluctant to admit they cannot be fair"). For this reason, the fact that "none of the seated jurors and alternates checked the 'yes' box" on the written questionnaire when "asked whether they 'ha[d] an opinion about [Skilling],'" *ante*, at 26, is of minimal significance, particularly given that the Causey plea and the impending trial received significant media coverage *after* the questionnaires were submitted.

Juror 11 wrote that he "work[ed] with someone who worked at Enron"; that he got Enron-related news from the "Houston Chronicle, Channel 2 News, Channel 13 News, O'Reilly Factor, [and] talking with friends and co-workers"; that he regularly visited the Chronicle Web site; that "greed on Enron's part" caused the company's collapse; and that "a lot of people were hurt financially." Supp. App. 26sa–30sa. During questioning, he stated that he would have "no problem" requiring the Government to prove its case, but he also told the court that he believed Lay was "greedy" and that corporate executives are often "stretching the legal limits . . . . I'm not going to say that they're all crooks, but, you know." App. 857a, 854a. Asked whether he would "star[t] the case with sort of an inkling that because [Lay is] greedy he must have done something illegal," he offered an indeterminate "not necessarily." *Id.*, at 857.[23]

_____

[23] Many other seated jurors and alternates expressed similarly troubling sentiments. See, *e.g.*, Supp. App. 57sa–60sa (Juror 20) (obtained Enron-related news from the Chronicle and "local news stations"; blamed Enron's collapse on "[n]ot enough corporate controls or effective audit procedures to prevent mismanagement of corporate assets"; and was "angry that so many people lost their jobs and their retirement savings"); *id.*, at 72sa–75sa (Juror 38) (followed Enron-related news from various sources, including the Chronicle; was "angry about what happened"; and "fe[lt] bad for those that worked hard and invested in the corp[oration] only to have it all taken away"); *id.*, at 117sa–118sa (Juror 64) (had several friends who worked at Enron and lost money; heard about the Enron cases on the news; described the collapse as "sad" because "people lost jobs [and] money—lots of money"; and believed the Government "did the right thing" in its investigation); *id.*, at 177sa–181sa (Juror 87) (received Enron-related news from the Chronicle, Channel 13 news, the O'Reilly Factor, Internet news sources, and friends, family, and co-workers; attributed Enron's collapse to "[p]oor management [and] bad judgment—greed"; lamented "[t]he sad state of the long-term loyal employees who are left with nothing in their retirement accounts"; and "admire[d] [the] bravery" of Enron whistle-blower Sherron Watkins "for bringing the situation to the attention of the public, which stopped things from getting worse"); *id.*, at 191sa–

Opinion of SOTOMAYOR, J.

While several seated jurors and alternates did not make specific comments suggesting prejudice, their written and oral responses were so abbreviated as to make it virtually impossible for the District Court reliably to assess whether they harbored any latent biases. Juror 13, for instance, wrote on his questionnaire that he had heard about the Enron cases from the "[n]ews." Supp. App. 42sa. The court questioned him for two minutes, during which time he confirmed that he had "heard what's on the news, basically," including "that the trial had moved from the 17th to the 31st." He added that the story "was all over the news on every detail of Enron." App. 858a–860a. No meaningful information about his knowledge or attitudes was obtained. Similarly, Juror 78 wrote that she had not followed Enron-related news but was aware that "[m]any people lost their jobs." Supp. App. 151sa. The court questioned her for less than 90 seconds. During that time, she acknowledged that she had "caught glimpses" of the coverage and "kn[e]w generally, you know, that the company went bankrupt" and that there "were some employees that went off and did their own businesses." App. 969a. Little more was learned.[24]

_____

195sa (Juror 90) (heard Enron-related news from his wife, co-workers, and television; wrote that "[i]t's not right for someone . . . to take" away the money that the "small average worker saves . . . for retirement all his life"; and described the Government's Enron investigation as "a good thing"); *id.*, at 221sa–225sa (Juror 113) (obtained information about Enron from a "co-worker [who] was in the jury pool for Mrs. Fastow's trial"; worked for an employer who lost money as a result of Enron's collapse; found it "sad" that the collapse had affected "such a huge number of people"; and thought "someone had to be doing something illegal"); *id.*, at 236sa–237sa (Juror 116) (knew a colleague who lost money in Enron's collapse; obtained Enron-related news from the "Houston Chronicle, Time Magazine, local TV news [and] radio, friends, family, [and] co-workers, [and] internet news sources"; and noted that what stood out was "[t]he employees and retirees that lost their savings").

[24] Several other jurors fell into this category. Juror 67 wrote on his

In assessing the likelihood that bias lurked in the minds of at least some of these seated jurors, I find telling the way in which *voir dire* played out. When the District Court asked the prospective jurors as a group whether they had any reservations about their ability to presume innocence and put the Government to its proof, only two answered in the affirmative, and both were excused for cause. *Id.*, at 815a–820a. The District Court's individual questioning, though truncated, exposed disqualifying prejudices among numerous additional prospective jurors who had earlier expressed no concerns about their impartiality. See n. 7, *supra.* It thus strikes me as highly likely that at least some of the seated jurors, despite stating that they could be fair, harbored similar biases that a more probing inquiry would likely have exposed. Cf. *Yount*, 467 U. S., at 1034, n. 10 (holding that the trial court's "particularly extensive" 10-day *voir dire* assured the jury's impartiality).[25]

---

questionnaire that he had heard about Enron from the Chronicle and "Internet news sources." *Id.*, at 133sa. He was questioned for 90 seconds, during which time he indicated that he had read an article on the Internet the preceding night "about the jury selection taking place today, stuff like that." App. 944a. Juror 99 wrote that she had not heard or read about the Enron cases and did not "know anything about" Enron. Supp. App. 210sa. The District Court questioned her for barely one minute. She stated that she had "[n]ot really" learned more about the case, but added that she had heard "this and that" from her parents. App. 995a–996a. The court did not press further.

[25] The majority suggests that the fact that Skilling "challenged only one of the seated jurors for cause" indicates that he did not believe the other jurors were biased. *Ante*, at 31. Our decisions, however, distinguish claims involving "the partiality of an individual juror" from antecedent claims directed at "the partiality of the trial jury as a whole." *Patton* v. *Yount*, 467 U. S. 1025, 1036 (1984); see also *Frazier* v. *United States*, 335 U. S. 497, 514 (1948) ("[T]he two sorts of challenge[s] are distinct and are therefore to be dealt with separately"). If the jury selection process does not, as here, give a defendant a fair opportunity to identify biased jurors, the defendant can hardly be faulted for failing to make for-cause challenges.

The majority suggests, *ante*, at 17–18, 30, that the jury's decision to acquit Skilling on nine relatively minor insider trading charges confirms its impartiality. This argument, however, mistakes partiality with bad faith or blind vindictiveness. Jurors who act in good faith and sincerely believe in their own fairness may nevertheless harbor disqualifying prejudices. Such jurors may well acquit where evidence is wholly lacking, while subconsciously resolving closer calls against the defendant rather than giving him the benefit of the doubt. Cf. *United States* v. *McVeigh*, 918 F. Supp. 1467, 1472 (WD Okla. 1996) (prejudice "may go unrecognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence. That something has its most powerful effect if it generates strong emotional responses"). In this regard, it is significant that the Government placed relatively little emphasis on the nine insider trading counts during its closing argument, declining to explain its theory on all but one of the counts in any detail whatsoever. Record 37010. The acquittals on those counts thus provide scant basis for inferring a lack of prejudice.

*     *     *

In sum, I cannot accept the majority's conclusion that *voir dire* gave the District Court "a sturdy foundation to assess fitness for jury service." Cf. *ante*, at 29. Taken together, the District Court's failure to cover certain vital subjects, its superficial coverage of other topics, and its uncritical acceptance of assurances of impartiality leave me doubtful that Skilling's jury was indeed free from the deep-seated animosity that pervaded the community at large. "[R]egardless of the heinousness of the crime

charged, the apparent guilt of the offender[,] or the station in life which he occupies," our system of justice demands trials that are fair in both appearance and fact. *Irvin*, 366 U. S., at 722. Because I do not believe Skilling's trial met this standard, I would grant him relief.